RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

DONOVAN E. SIMPSON,

        *Petitioner-Appellant,*

    *v.*

WANZA JACKSON, Warden,

        *Respondent-Appellee.*

No. 08-3224

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 06-00127—Edmund A. Sargus, Jr., District Judge.

Argued: April 21, 2010

Decided and Filed: July 13, 2010

Before: MARTIN, SUHRHEINRICH, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Brian Fletcher, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Gene D. Park, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Brian Fletcher, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellant. Gene D. Park, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    MARTIN, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. WHITE, J. (pp. 35-39), delivered a separate opinion dissenting in part and concurring in part.

───────────────

## OPINION

───────────────

    BOYCE F. MARTIN, JR., Circuit Judge. Petitioner Donovan Simpson, an Ohio inmate, seeks habeas relief from his convictions for aggravated murder, murder, five counts of attempted murder, aggravated arson, and five counts of felonious assault, all arising from

1

a fatal arson. An Ohio jury convicted him under an aiding and abetting theory for assisting another individual in preparing a "Molotov cocktail" and helping the individual flee after throwing the bomb at a house, resulting in the death of a child sleeping inside. Simpson claims that four of his statements—made on April 24, April 27, June 16, and June 20, 2000—were erroneously admitted into evidence in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny, as well as in violation of the Fifth Amendment. For the reasons set forth below, we find that the June 16th statement was properly admitted into evidence but that the state court's admission of the statements made on April 24th, April 27th, and June 20th was contrary to and an unreasonable application of Supreme Court precedent at the time the conviction became final. These errors were harmless as to Simpson's convictions for aggravated arson and felonious assault, so we deny relief as to those convictions. However, the errors were not harmless as to the convictions for aggravated murder, murder, and attempted murder, so we grant Simpson a writ of habeas corpus as to those convictions.

## I.

### A.    Factual Background

The last state court decision on the merits, *see Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir. 2007), is that of the Court of Appeals of Ohio on Simpson's direct appeal. That court set forth the facts as follows:

> In the early morning hours of October 27, 1997, a fire broke out at 151 South Wheatland Avenue in Columbus, Ohio. At the time, Aleta Bell and three of her four children, Shenequa, age five, Elijah, age three, and Myesha, five-months old, were asleep in the house. Also sleeping in the house were two men, Terrance Hall and Gary Williams, Myesha's father. Hall was awakened early that morning by a loud crash of glass. He found the house engulfed in flames. After running out of the house, Hall was able to wake Aleta Bell and Williams, who were sleeping with Myesha in the same room. They were able to get out of the house. Unfortunately, they were not able to reach the two children who were sleeping in a back bedroom. Members of the Columbus Fire Department ("CFD") arrived on the scene and were able to find the two children and take them directly to Children's Hospital. However, as a result of the injuries sustained in the fire, Shenequa Bell died days later. Elijah Bell survived, but suffered serious injuries.
>
> By indictment filed August 24, 2000, appellant was charged with thirteen counts relating to the fire at 151 South Wheatland Avenue. Appellant was charged with two counts of aggravated murder for the death of Shenequa

Bell, in violation of R.C. 2903.01. Both counts contained death penalty specifications pursuant to R.C. 2929.04(A). Appellant was also charged with five counts of attempted murder of the five other people in the house, in violation of R.C. 2923.02 and 2903.02; one count of aggravated arson, in violation of R.C. 2909.02; and five counts of felonious assault, in violation of R.C. 2903.11. Appellant entered a not guilty plea to all of the charges and proceeded to a jury trial.

Before his trial, appellant sought to suppress four verbal statements he made to police officers prior to being indicted. Two of these statements, one on April 24 and another on April 27, 2000, were made to officers while appellant was incarcerated in the Licking Southeastern Correctional Institution for an unrelated crime. Both of these statements were recorded. No *Miranda* warnings were given to appellant before he made these statements. The other two statements, one on June 16 and one on June 20, 2000, were made at Columbus Police Headquarters. Both of these statements (which were essentially confessions) were videotaped. Appellant was read his *Miranda* rights before these statements were made and he signed a form indicating he understood and waived those rights. After an evidentiary hearing, the trial court denied his motion thereby permitting the state to introduce these statements into evidence at trial.

The following key testimony was presented during the state's case.

. . . .

Detective Edward Kallay, Jr., a homicide detective who was the primary investigator in this matter for the Columbus Police Department ("CPD"), testified that, in January 2000, he had a conversation with a man named Adiyat Diggs. Based upon that conversation, Kallay believed that appellant might have information about a suspect who the police thought could have been involved in starting this fire. On April 24, 2000, Detective Kallay and Federal Special Agent Ozbolt spoke with appellant at the Southeastern Correctional Institution in Licking County where appellant was incarcerated. Their conversation was recorded.

Detective Kallay testified that appellant told him that he had picked up a man named Daryl "Pumpkin" Kelly the day before the fire and took him to a bar to meet a woman named Leah.[1] Appellant waited outside while Daryl Kelly went into the bar. When Kelly and Leah came out, appellant heard Leah tell Kelly to "take care of this for me." Appellant told Detective Kallay that he got a call from an excited Daryl Kelly the next morning who said he needed another ride. When appellant picked Kelly up, he said that Kelly smelled like gasoline. Daryl "Pumpkin" Kelly was a suspect even before appellant provided this information.

> [1] Leah was Leah Smith, a former friend of Aleta Bell who lived in the other half of the house at 151 South Wheatland Avenue. Days before the fire, Leah had moved out of the

house.  The two had been involved in a dispute earlier in the summer of 1997, when Aleta Bell accused Leah of forging a driver's license with Aleta's personal information but with Leah's picture.  When Aleta found the driver's license, she took it back.  Leah later broke into Aleta's home and stole the driver's license.  Leah was charged with and pled guilty to one count of burglary arising from that incident.

Three days later, on April 27, 2000, Detective Kallay and Special Agent Ozbolt went to the Southeastern Correctional Institution to talk with appellant again.  In a recorded conversation, appellant again implicated Leah and Kelly in the fire at 151 South Wheatland Avenue.  Following this conversation, the officers obtained appellant's release on probation so that he would cooperate with them in their investigation.  However, appellant failed to cooperate, leading the officers to believe that appellant had more to do with the fire than he was admitting.  Due to appellant's failure to cooperate with the investigation and failure to abide by the terms of his probation, Detective Kallay arrested appellant on June 16, 2000.

After he was arrested, appellant was taken to CPD headquarters and interrogated by Detective Kallay and Special Agent Ozbolt.  The interrogation was videotaped.  It is undisputed that, prior to being questioned, appellant was read his *Miranda* rights.  During questioning, appellant admitted his involvement in starting the fire.  He said that he met Leah and Kelly the day before the fire when Leah asked appellant to take Kelly somewhere that night.  Later that evening, Kelly and appellant took two empty bottles of alcohol and filled them with gasoline.  They brought the bottles to Leah who showed them how to make a Molotov cocktail.  Appellant and Kelly then went to the area of 151 South Wheatland Avenue and drove into an alley.  After smoking some crack, Kelly got out of the car with the two bottles and, a few seconds later, appellant heard glass break and then saw Kelly running back towards the car without the bottles.  The two sped away to a crack house, where they paged Leah.  She arrived and paid them both with crack cocaine.

Detective Kallay further testified that, following these admissions, he made arrangements to have appellant take a polygraph test.  On June 20, 2000, appellant was brought again to the CPD to take the test.  It is undisputed that appellant was read his *Miranda* rights again.  However, Detective Kallay testified that appellant was uncooperative so the test could not be performed.  Appellant's lack of cooperation was confirmed by the testimony of Randy Walker, who had been hired to administer the test.  Nevertheless, while in the room waiting to take the test, appellant made more admissions regarding his involvement in the fire.  Again, this interrogation was videotaped.

Appellant's recorded statements of April 24th, April 27th and his videotaped confessions of June 16th and June 20th were played for the jury over appellant's objections.

The state then called Stanley Bowen, a Deputy Sheriff for Licking County. Deputy Bowen was employed as a supervisor at the jail in which appellant was incarcerated in April 2000. Deputy Bowen testified that he overheard appellant ask "why didn't they charge the bitch too. It was her idea to start the fire." In addition, an inmate, who was in a cell next to appellant, testified that appellant told him all about the fire. He said that appellant told him there were three people involved, and that they used Molotov cocktails to firebomb the house.

. . . .

After deliberating, the jury returned verdicts finding appellant guilty of all five counts of attempted murder and felonious assault, guilty of one count of aggravated arson, guilty of the lesser included offense of murder of Shenequa Bell, and guilty of the aggravated felony-murder of Shenequa Bell, also finding appellant guilty of the death penalty specification because the aggravated murder was part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons.

*State v. Simpson*, No. 01AP-757, 2002 Ohio App. LEXIS 3785, at *1-12 (Ohio Ct. App. July 23, 2002).

We note the following additional undisputed material facts that do not appear in the state court's factual recitation. The April 24th interview was held in a conference room in the warden's office. Simpson was pulled from the general prison population and escorted to the warden's office by prison guards. (Appellee's Br. at 16-17.) During the interview, the officers, on the one hand, accused Simpson of being with Kelly at the time of the incident but, on the other hand, told him that he was not a suspect. (A63-64, A133.)[1] The April 27th interview occurred while Simpson was in the prison's infirmary. (A136-37 ("Q: Okay. And again, how was that meeting arranged? A: They just came down there [the infirmary].").)

On direct appeal, the court upheld all of the convictions, but it vacated the sentence for reasons not material to this case. At re-sentencing, the court imposed discrete sentences for each conviction. On Count I, Murder, the court imposed a sentence of fifteen years to life in prison. On Count II, Aggravated Murder, the court imposed a sentence of life in prison, with thirty years before parole eligibility. On

---

[1]Citations to the Petitioner's Appendix will appear as "A__" in keeping with the parties' convention in their briefs.

Counts III-VII, Attempted Murder, the court imposed a sentence of eight years in prison on each of the convictions. On Count VIII, Aggravated Arson, the court imposed a sentence of nine years in prison. On Counts IX-XIII, Felonious Assault, the Court imposed a sentence of eight years in prison on each conviction. The court found that Counts I and II merged for purposes of sentencing. The court ordered that the eight-year Felonious Assault sentences, Counts IX-XIII, would be served concurrently to each other and would merge with the eight-year Attempted Murder sentences, Counts III-VII, for purposes of sentencing. The court further ordered that the life-with-parole-eligibility-after-thirty-years sentence on Count II would run consecutive to the eight-year sentences for Counts III-VII, which would also run consecutive to each other, and consecutive to the nine-year sentence on Count VIII. Stated more plainly, the court sentenced Simpson to five consecutive eight-year terms (Attempted Murder), for a total of forty years, plus a nine-year term (Aggravated Arson), plus a term of at least thirty years (Aggravated Murder). This adds up to a total term of imprisonment of no less than seventy-nine years, and potentially life, in prison.

## B.        Procedural Background

Simpson filed his original petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on February 24, 2006, asserting numerous grounds for habeas relief. On April 16, 2007, the Magistrate Judge issued a Report and Recommendation finding all of Simpson's claims either procedurally defaulted or meritless, save the claims regarding his two April statements and his two June statements. The Magistrate Judge found that the admission of the April statements, if in error, was harmless. The Magistrate Judge directed the state to supplement the record regarding the June statements to allow for further evaluation. The district court overruled Simpson's objections to this Report and Recommendation on August 6, 2007. On November 2, 2007, the Magistrate Judge issued a second Report and Recommendation finding the remaining claim regarding the June statements to be meritless. The district court overruled Simpson's objections to this Report and Recommendation on January 2, 2008 and, therefore, dismissed Simpson's petition. Simpson timely appealed, and this Court

granted a certificate of appealability as to the admission of Simpson's April and June statements.

**II.**

We review a district court's decision regarding questions of law in a habeas proceeding de novo. *Avery v. Prelesnik*, 548 F.3d 434, 436 (6th Cir. 2008).

Simpson's federal habeas petition was filed subsequent to the passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA") in 1996 and, thus, its provisions govern this Court's review. Under AEDPA, a federal court may not grant habeas relief unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the "contrary to" provision, a federal habeas court should grant the writ "if the state court arrived at a conclusion 'opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). Under the "unreasonable application" clause, a habeas court may grant the writ if the state court identified the correct legal principle from the Supreme Court's decisions but unreasonably applied that principle to the petitioner's case. *Boykin*, 541 F.3d at 642.

## III.

### A.      June Statements

Though the April statements occurred first, their relevance was tied to the June statements because the State used the April statements to cast doubt on the veracity of aspects of Simpson's June statements, in which he sought to minimize his involvement in the planning and carrying out of the arson.  We therefore begin the analysis with the June statements.

#### 1.      June 16th Statement

Simpson's June 16th statement occurred after he had been arrested, ostensibly for violating the conditions of his judicial release.  As described above, in return for his continued cooperation, Detective Kallay and Agent Ozbolt had arranged for Simpson's early "judicial release" from jail on an unrelated offense.  When Simpson did not promptly reestablish contact upon his release, the officers caused Simpson's arrest to focus his attention back on the arson investigation, even though Simpson was technically arrested for violations of his judicial release, such as missing two drug tests.  Thus, Simpson was detained on June 16th for essentially two different reasons at the same time—the release violations and the arson investigation.  This presented a situation in which Kallay and Ozbolt could exert significant pressure through the potential consequences of his release violations in order to get Simpson to cooperate in the arson investigation.

The June 16th interview began with both officers in an interview room with Simpson,[2] generally discussing Simpson's current arrest and his failure to contact the officers upon his release.  Approximately six and one half minutes into the conversation, one of the officers left, but the other officer remained in the room.

---

[2]The June 16th interview was video recorded and is part of the record.  The portion relevant to the *Miranda* issue begins approximately at the 6:00 mark (or the 2:23 p.m. mark on the recording itself) and lasts through the 12:08 (or 2:29 p.m.) mark.

The remaining officer immediately informed Simpson that, because he was "technically" in custody, the officer must inform him of his *Miranda* rights. Simpson initially protested even being read his rights, *i.e.* he asked that the officer "please" not read him his rights. The officer persisted and eventually read Simpson his *Miranda* rights and gave him a copy of the rights to read. Simpson expressed that he understood his rights. The officer then asked "are you willing to waive your rights, continue talking with us?" Simpson responded: (1) "mmm-mmmm," clearly in a negative way; (2) a sideways shake of his hand and a slight shake of his head; (3) mumbling something and then saying "nah" or "naw"; and (4) then saying "I messed up last time I did that." The officer then replied, "So you don't want to talk to us? You do or you don't want to talk to us?" Simpson responded with more negative body language and said, "I mean, it can't help."

Following four to five seconds of silence, the officer said, "Well that's up to you, whether you want to talk to us or not, we're not going to twist your arm or anything like that." Simpson *immediately* responded, "what y'all wanna talk about?" and the officer stated, "just basically what we're talking about now." We will refer to the colloquy up to this point as the "first *Miranda* interaction." Everything that follows will be referred to as the "second *Miranda* interaction."

Over the next one and one half minutes, Simpson questioned the officer about the details of his current situation, having been arrested and going back to jail, where he would be incarcerated, what his violations were, etc. Critically, the officer did not ask Simpson any substantive questions,[3] instead only responding to Simpson's questions and explaining that he was arrested for violating the terms of his release.

The other officer then came back into the interview room. There was an eight-to-nine second period of silence, and the first officer then asked, "so do you want to talk

---

[3]The officer did ask one question during this second colloquy, but it can only be characterized as a non-substantive rhetorical question. Simpson asked, "why can't y'all give me some simple shit," in relation to the deal Simpson had struck to cooperate in return for early release. The officer responded by asking, "how can we get any more simple than that?" This "question" thus does not run afoul of Simpson's previous expression of a desire not to waive his rights.

to us about any of this or not?" Simpson responded by mumbling something, and even the tenor of his response is unclear. The second officer, who had not been present during the first *Miranda* interaction, then said, "all right, since its a custodial interview, which means you're under arrest for that stuff, it's pretty customary that we advise you of your rights first." Simpson responded that the first officer had already discussed the *Miranda* rights. The first officer presented Simpson with a waiver of rights form and said, "just go ahead and look that over, and if you're willing to talk to us, just go ahead and sign the waiver, and we can move on. Just need to make sure you understand all that." Simpson began reading the form and said, "I mean, this right here, it really don't make no difference, you know what I'm saying, sign it or not." The second officer responded, "that's what we're saying, but its a formality, and that's what we're required by law to do."

At this point in the interview, it is apparent that Simpson was still struggling with the fact that, while he has been arrested for violations of his release conditions, the interview is more about the arson. He indicated the waiver of rights form and said, "this thing right here, I mean, talking about 'may be used against me.' For what?" The second officer responded, "Well what would happen if you came out and said that, you know, 'I killed one of the people with [inaudible].' Then, you know, if you tell us that, and we didn't advise you of your right, we'd lose that statement in court." Simpson then executed the waiver of rights form.

### a. *Miranda* **Warning**

Simpson argues that the officers violated *Miranda* when they questioned him after he expressed his desire to remain silent. In his brief, Simpson focuses exclusively on the first *Miranda* interaction. Simpson argues that, at that point, he had clearly invoked his desire to remain silent, so the interview should have ceased. The warden, surprisingly, accepts the premise that this is the only relevant discussion. (*See* Resp. Br. at 33 (accepting Simpson's transcription of the relevant portion of the June 16th interrogation).)

The warden argues that, at the conclusion of the first *Miranda* interaction, Simpson's inclination remained unclear. However, at that point in time, Simpson had said "mmm-mmmm," "naw," and "I messed up last time I did that." Tellingly, the officer responded by asking, "So you don't want to talk to us? You do or you don't want to talk to us?" By virtue of the first question, it is clear that the officer understood Simpson to be leaning towards saying that he did not want to talk. If that were not enough, Simpson responded with additional dismissive, negative body language and said, "I mean, it can't help," and then a noticeable silence elapsed. Thus, if the analysis were to end here, the warden would likely be incorrect that Simpson's desire to remain silent was in doubt.

But the analysis does not end there. Simpson focuses on too narrow of a slice of the colloquy and, instead, we must look at the entire six-minute conversation, which includes both the first *Miranda* interaction and the second. Viewed in its entirety, we conclude that the officer honored Simpson's initial inclination to remain silent because the officer did not ask any material questions and, instead, only responded to Simpson's inquiries. Once the other officer returned, they returned to the issue of *Miranda*, and Simpson executed the waiver of rights form.

When viewed in this light, the officers' actions were not inappropriate. As a matter of first principles, *Miranda* is only directed at interrogation or its functional equivalent—the police may not continue an interrogation after the interviewee has invoked his right to remain silent. *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (restricting the definition of "interrogation" for *Miranda* purposes to express questioning and words or actions by the police "that the police should know are reasonably likely to elicit an incriminating response"). Here, the officers did not ask Simpson any material questions until they revisited the issue of whether he wished to waive his *Miranda* rights and discuss substantive matters, to which Simpson immediately consented.

Similarly, even Simpson concedes that, when a suspect does not clearly invoke his right to remain silent or when the invocation is ambiguous, officers may follow up with clarifying questions. *Davis v. United States*, 512 U.S. 452, 461-462 (1994); *see*

*also Berghuis v. Thompkins*, 560 U.S. __, 2010 WL 2160784, at *8 (June 1, 2010) (stating "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*."). Here, Simpson initially indicated a desire to remain silent. When the officer responded, "Well that's up to you, whether you want to talk to us or not, we're not going to twist your arm or anything like that"—which was, in context, a non-coercive statement—Simpson immediately responded by asking the officer what he wanted to talk about. He then asked several questions of the officer until the second officer returned. Thus, the officers were faced with an individual who had indicated that he did not want to talk and yet continued to talk. Accordingly, it was not unreasonable or impermissible for the officers to have circled back to the *Miranda* issue to clarify whether Simpson wished to waive his rights before asking him any substantive questions. Indeed, the Supreme Court encouraged such clarifying questions in *Davis*, 512 U.S. at 461, and four Justices would have *required* that officers seek clarification in the face of an ambiguous invocation of *Miranda* rights. *Id.* at 476 (Souter, J., concurring).

Finally, it is well-established that a suspect's voluntary, unsolicited statements after an invocation of *Miranda* rights are not excluded. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). This is because, in the unsolicited statement scenario, the officers have scrupulously honored the suspect's invocation and have not interrogated him. Though Simpson's is not a case of unsolicited statements, the *Edwards* line of cases is relevant for what it assumes—that it is permissible for the officers still to be in the same room with the interviewee for at least some period of time after he invokes his right to remain silent. The officers need not immediately leave the room; they simply may not continue questioning or badgering the suspect. But, for Simpson to prevail, his theory must be that the officers should have immediately, in a matter of seconds, left the room when he said, "I mean, it can't help." This is not the law, so there was nothing wrong with the officers remaining in the room for the few seconds until Simpson asked the officers what they wanted to talk about, nor was there any prohibition on the officers answering Simpson's questions.

In sum, there are at least three arguments to support the validity of Simpson's waiver of his *Miranda* rights. Furthermore, Simpson has not pointed to any Supreme Court case indicating that the officers' actions in these or similar circumstances were improper. Accordingly, we find that the officers validly obtained the waiver of Simpson's *Miranda* rights prior to the June 16th interview.

### b.　　　Fifth Amendment Coercion

Simpson next argues that, even if the officers did not violate *Miranda*, his June 16th statement was coerced in violation of the Fifth Amendment's prohibition on compelled confessions. He does not claim that the officers utilized improper physical tactics. Instead, he claims that they used a combination of threats and promises, which had the cumulative effect of overbearing his will.

Whether a confession was voluntary depends upon "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Supreme Court has held that the combination of threats and promises may rise to the level sufficient to overbear an interviewee's will, rendering any confession the product of impermissible coercion. *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (recognizing that, in the face of a powerful combination of threats and promises, even "[a] defendant who is completely innocent might well confess"). However, as a plurality of the Supreme Court noted in *Missouri v. Seibert*, 542 U.S. 600 (2004), "maintaining that a statement is involuntary even though given after [*Miranda*] warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Id.* at 609; *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."). Accordingly, it is clear that a defendant faces an uphill climb when, as here, he argues that a confession was involuntary even though he properly received and waived his *Miranda* rights. And as

an implicit derivative principle, in light of these candid statements from the Supreme Court, the facts of a given interview must be especially egregious to lead to the conclusion that a state court's application of Supreme Court involuntariness case law was unreasonable for purposes of habeas relief under AEDPA.

Although the June 16th interview came about as the result of Simpson's arrest for violation of his release conditions, it must be remembered that Simpson previously had agreed to cooperate with the officers in return for his early release. Thus, Simpson was familiar with the officers, and that he would interact with them after his release should have come as no surprise to Simpson. Simpson points to two "threats" made by the officers during the interview. First, the officers warned Simpson that he faced a new felony charge for failure to comply with his release provisions and "guaranteed" that the felony charge would be filed unless he provided information about the arson. (A396-97.) Second, they stated, "This is your opportunity. 'Cause if not, you're going down with [Kelly], and guess what? Being an accomplice carries the same penalty as the person that threw the bottle. . . . We've proven to you that we don't play games. We don't bluff." (A402.) The officers also stated, "You are not the focus of our investigation. But if we leave this room tonight with no answers, you will be. . . . You are looking at the rest of your life, possibly the death—death row. If that's the game you want to play, Peanut, we'll take you there." (A404.)

In addition to these threats, Simpson also points to promises of leniency that he claims contributed to the overbearing of his will. With regard to the charge for violating his release conditions, one of the officers stated, "You want to help yourself, now's the time to help yourself. 'Cause that charge ain't been filed yet." (A397.) With regard to the arson, the officers stated that they "ultimately wanted to get Pumpkin [Kelly] and Leah" and that, if he confessed to his involvement, the officers would "work with" him and "talk to whomever." (A402-03.) Simpson also points to the following colloquy:

> Kallay: We did not accuse you of anything. We're not gonna accuse you of anything except being there.
> Simpson: See, that's, that's a crime man.

> Kallay:          It, it could be a crime if you continue doing what you're doing.

(A409-10.)  Simpson contends that this statement implied that he would not be charged if he admitted to being there and implicated Kelly and Leah.

In addition to those highlighted by Simpson, another aspect of the interview bears upon Simpson's decision to implicate himself.  Simpson has several children.  It seems that, upon his release from jail, he had been living with his youngest son, and he was with this son when he was re-arrested.  He was clearly concerned about being away from his son, and the officers played upon this.  Several times, they suggested that Simpson tell the truth so that he could get back to his son.  And, more effectively, the officers played on Simpson's conscience, making repeated comparison between Simpson's children and the child killed in the fire.  The video shows that this tactic was extremely effective—one can almost see the emotional struggle going on in Simpson's mind.

Simpson primarily relies upon *Lynumn v. Illinois*, 372 U.S. 528 (1963), as clearly established Supreme Court law holding that threats and promises may combine to render a confession involuntary.  There, the Court held that a defendant's confession to selling marijuana was involuntary.  *Id.* at  534. The defendant testified that, immediately upon entering her apartment, the officers threatened that she would never see her children again if she did not confess but assured her that they would recommend that the prosecutor not charge her if she cooperated.  *Id.* at 531-32.  The Court held that, under these circumstances, it was "clear" that the confession could not be deemed voluntary; in fact, the state conceded that the confession was coerced but argued that the error was harmless.  *Id.* at 534-35.

The major flaw in Simpson's reliance upon *Lynumn* is that the *Lynumn* defendant had not received *Miranda* warnings before the confession; indeed, *Lynumn* predates *Miranda* by three years.  As the more recent cases, like *Berkemer* and *Seibert*, teach, it has become much more difficult to argue the involuntariness of a confession if *Miranda* warnings have been given and the rights have been waived.

Thus, we must analyze Simpson's case under the more general involuntariness doctrine. As we stated in *Ledbetter*:

> In determining whether a confession has been elicited by [psychological] means that are unconstitutional, this court looks at the totality of the circumstances concerning "whether a defendant's will was overborne in a particular case." Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

35 F.3d at 1067. Applying these factors to the June 16th interrogation, none cuts strongly in Simpson's favor, and certainly not so strongly that a state court's conclusion to the contrary could be deemed objectively unreasonable. Though it is not clear from the record what level of education Simpson has achieved, it is clear that he had extensive experience with the criminal justice system. Thus, on June 16th, the experience of being questioned by the police was not new or novel to him. Furthermore, Simpson had a prior, consensual relationship with the officers. He had agreed to continue speaking with them even before this specific interrogation. And though the officers did employ threats and promises in their effort to obtain Simpson's full disclosure, the video reveals that the most effective tactic was the play on his conscience. Simply stated, under the totality of the circumstances, Simpson has not met his burden of showing circumstances so severe that there is a substantial risk that his will was overborne. We therefore deny Simpson habeas relief as to the June 16th statement.

### 2.    June 20th Statement

Though Simpson admits that he technically waived his *Miranda* rights during the June 20th interrogation, he contends that the waiver was not voluntary and, thus, ineffective. His argument is more appropriately framed as two distinct attacks on the validity of his *Miranda* waiver. First, Simpson advances a pure involuntariness argument, arguing that the officers obtained the waiver by using false promises, threats, and misleading statements that he had "no choice" except to talk with them. We find

this argument unpersuasive. Second, Simpson argues that the officers violated *Miranda* by discouraging him from consulting with an attorney. This argument is significantly more persuasive, as the facts are not materially distinguishable from the facts in *Kyger v. Carlton*, 146 F.3d 374 (6th Cir. 1998), in which we found a clear violation of *Miranda*.

Coming into the June 20th interview, Simpson had already given incriminating statements on June 16th. He had confessed to being with Kelly immediately prior to the arson while Kelly prepared the Molotov cocktail and to driving the car before and after Kelly threw the Molotov cocktail at the house, though he disclaimed having been involved in the planning of the attack or having any intent to kill or harm anyone. Detective Kallay and Agent Ozbolt seem to have suspected that Simpson was more involved than he claimed. They therefore proposed, at the end of the June 16th interview, that Simpson take a polygraph test. They essentially told him that, if he had been completely truthful on the 16th, he would pass the test and they would continue to work with him and seek favorable treatment from the prosecutor. If he failed the lie detector, they would "know" that he was more involved than he had admitted, and the officers would recommend that the prosecutor bring the most serious possible charges against Simpson. Thus, the officers proposed the lie detector for two purposes. The first purpose was to test the truth of Simpson's June 16th statement. The second purpose was to get Simpson to confess to his "true" role in the arson by telling him that, if he lied, the test would pick it up, so he should come clean before the test. On June 16th, Simpson initially agreed to take the test. However, he was less than cooperative when the time actually arrived on June 20th.

At the end of the June 16th interview, the officers were very blunt with Simpson about how his case would proceed. The relevant dialogue was as follows:

> Kallay:　　　Tuesday morning we pick you up and bring you in for a polygraph. You pass the polygraph then we'll reinstate your bond. Under the stipulation that you do what you're told with us. You don't do that, we'll charge you with complicity to commit agg murder, right away.
>
> Ozbolt:　　　And that ain't no bullshit.

| Kallay: | That is no bullshit. You don't have a choice at this time. |
| Ozbolt: | Let me ask you this. Is that agreeable to you? You gonna pass the polygraph? 'Cause if there's something else you need to tell us, tell us now. |
| Simpson: | No, that's it. |
| Ozbolt: | Hmmm. |
| Simpson: | What'd you say I charged with? |
| Kallay: | Complicity to agg murder. If you fail to do any of that, that's exactly what you'll get charged with. If you want to run, you can run, but we will find you. |

. . . .

| Simpson: | But agg murder, but that's how much time, doesn't that carry life in jail? |
| Kallay: | Mmmm-hmmm. Life with no parole. You've got a lot of incentive. And we're not playing with you, that is the straight, honest to God truth. We could do that to you right now, if we wanted to. |
| Simpson: | What? Charge me? |
| Kallay: | Mmm-hmmm. But what did we tell you from the beginning? |
| Simpson: | Alright. |
| Kallay: | I want Leah. So does Dan [Ozbolt]. She's the one who caused this whole thing to happen. She's the one who caused this whole thing to happen. She's the one who needs to pay. |
| Simpson: | Right. |
| Kallay: | Pumpkin threw the fire . . . |
| Simpson: | Yes. |

. . . .

| Kallay: | You don't have alternatives. |
| Simspon: | I know. I was just thinkin', there's nothing, it's just straight forward . . . |
| Ozbolt: | Mmm-mmm. It's straight up. |
| Simpson: | Straight up, its just . . . |
| Ozbolt: | Complicity to commit aggravated murder. There's no nice way to say it. That's the way it is. |

(A492-94.)[4]

---

[4] Detective Kallay later admitted that the officers never intended to release Simpson and reinstate the bond if he took and passed the polygraph. When asked why he would tell Simpson that if it was not true, Kallay responded, "Because we had not had him take the polygraph test yet, and we still wanted him to take it." (A508-09.)

At the beginning of the June 20th interview, in preparation for the polygraph exam, Kallay had more strong words for Simpson. He stated at various times, "You don't cooperate on this case, you eat the whole thing. It's called agg murder—conspiracy to commit. . . . If you don't cooperate then . . . there are no holds barred, and you're gonna lose. You're gonna spend the rest of your life in jail. . . . If you don't take the test today . . . we're gonna file the paper on you today for complicity to commit agg murder. It's that simple." (A514-15, 518.)

### a. Voluntariness of *Miranda* Waiver

Simpson claims that (1) the promise that if he took and passed the polygraph, he would be released (which Kallay admitted was a false promise) and (2) the strong language indicating that Simpson had to take the polygraph or else be charged with aggravated murder, had the combined effect of overbearing his will, rendering his waiver of rights involuntary. The government bears the "heavy burden" of proving the voluntariness of a waiver of *Miranda* rights. *Miranda*, 384 U.S at 475. The voluntariness question requires an "inquiry into the totality of the circumstances surrounding the interrogation" to determine if the interviewee "in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979). And, as *Miranda* itself stated, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

Beginning with the argument regarding Kallay's false promise of release, Simpson points to our decision in *Williams v. Withrow*, 944 F.2d 284 (6th Cir. 1991), *rev'd in part on other grounds*, 507 U.S. 680 (1993). In *Williams*, we addressed a situation in which a police officer stated, "I'll make you a deal. You tell us everything that happened and you tell us the truth and I confirm it on a polygraph that you're telling us the truth. Yeah, you walk." 944 F.2d at 286. The officer subsequently formalized this into a promise of immunity if the suspect took and passed the polygraph. *Id.* at 287. We held that the prisoner was entitled to habeas relief because "an evaluation of 'the

entire course of police conduct' in this case establishes that Williams' statements were not voluntary. His statements were conditioned on his belief that he would be released if he talked. The officers' promises of leniency were intended to induce Williams' admissions." *Id.* at 289. However, *Williams* is distinguishable because, in that case, the officer explicitly promised immunity in return for taking and passing the polygraph. By contrast, here, the officers never told Simpson that he would not be charged in the arson if he passed the polygraph. They simply said that they would re-instate his bond on the previous, unrelated crime. Thus, Simpson was not like the suspect in *Williams* who confessed because he believed that doing so could get him out of any charges.

As to Simpson's claim that the officers' threatening aggravated murder charges if he did not participate in the polygraph rendered his waiver voluntary, the state court and the district court held that these were all essentially true statements. To be sure, they had a very strong influence on Simpson's decision to waive his rights on June 20th—he repeatedly indicated that he felt as if he did not have a choice (A521, 526) and even said that he felt that he was being "railroaded" (A527). But the state court and district court were correct that the officers were telling Simpson the truth about his predicament. In light of his June 16th statement, the officers already had enough evidence to charge him in the arson. In essence, the officers were merely informing Simpson of the options before him. So Simpson was correct that he did not have much of a choice, but this was simply an acknowledgment of reality.

Simpson cites no authority, much less clearly established Supreme Court authority, indicating that a waiver is involuntary if made after hearing the truth, or that officers may inform an interviewee of reality only when that reality is bright and cheery. *E.g. McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) ("We are not prepared to forbid police from conveying to suspects the seriousness of the crime for which they are being investigated."). Though the case may exist in which the ugly truth could be presented in such an overwhelming and combative way that a suspect would lose his free will, the circumstances of the June 20th interrogation do not strike us as that case.

Accordingly, neither the false promise regarding the polygraph nor the blunt statements regarding Simpson's options are sufficient to warrant habeas relief.

### b.    Right to Counsel

Simpson next contends that the police violated *Miranda* by suggesting that he needed an attorney only if he was lying. When the polygraph examiner, Officer Walker, began discussing Simpson's *Miranda* rights and indicated that Simpson had the right to have counsel present, Simpson replied, "Oh, I can have an attorney present?" (A528.) Walker responded, "You c-can any-anytime, you can always have an attorney present. It is my understanding that you wanted to take the test." (*Id.*) Simpson understandably seems to have taken this to mean that, if he wanted an attorney present, he would not be able to take the test that day. Furthermore, he had already been told that if he did not take the polygraph that day, he would be charged with aggravated murder immediately. But, for the reasons stated above, this is not problematic under *Miranda* because it was essentially the truth. The problem arises in what happened next:

| | |
|---|---|
| Walker: | Do you follow what I'm sayin'? That's . . . if you're telling me the truth, then you won't have a problem with the test. If you're lying, then, uh, yeah, if I was lying, I probably would, I'd probably get an attorney, I probably wouldn't take the test. |
| Simpson: | Oh. |
| Walker: | Yea, well, that's me. But that's a decision that, yeah, you know, you have to make. This part of the form is wordy and is-is lengthy. What this says is, that you are giving me permission to give you the exam. |

(A531-32.)

Simpson claims that we have held a materially identical exchange to violate *Miranda*. In *Kyger*, we addressed a situation in which the following transpired:

| | |
|---|---|
| Officer: | Steve, do you understand them rights? |
| Kyger: | Yes, sir. |
| Officer: | Alright, having them rights in mind, would you answer some of our questions, without an attorney present? |

| Kyger: | *I'd just as soon have an attorney [']cause, you know ya'll say there's been a shooting involved and that's a serious charge.* |
|--------|--------|
| Officer: | Yes it is but we're investigating.  We're not saying you shot anybody.  We're just investigating.  *Now, if you've got something to hide, I can understand you not wanting to sign that.  If you ain't got nothing to hide, you know, you can answer our questions.* |
| Kyger: | I ain't got nothing to hide. |
| Officer: | Okay.  But you don't want to answer our questions without an attorney present now? |
| Kyger: | You know, I'll answer a certain amount, you know. |
| Officer: | Okay, you know well you know you have the right to stop at any time.  That's (inaudible) . . . |
| Kyger: | Where do I sign at? |
| Officer: | Just where it says "sign." |
| Kyger: | Okay [Kyger then signs]. |

146 F.3d at 376-77 (emphasis added).  In light of this colloquy, we found that Kyger's statement was a request for counsel, such that the interrogation should have stopped immediately.  *Id.* at 379.  Importantly, however, we went on to state that:

> [Even] if Kyger's request was equivocal, the subsequent statement by the police ("Now, if you've got something to hide, I can understand you not wanting to sign that.  If you ain't got nothing to hide, you know, you can answer our questions.") was an inappropriate effort at pressuring Kyger to answer, rather than an appropriate attempt to get Kyger to clarify his response. This would also render this questioning constitutionally infirm.  *See Miranda*, 384 U.S. at 454 (disapproving of just such a tactic); *Davis v. United States*, 512 U.S. 452, 461 (1994) (approving the use of clarifying questions).

*Id.* (citation omitted).  As the *Kyger* Court noted, *Miranda* itself spoke ill of an interrogation technique in which the interrogator tries to dissuade a suspect from speaking with an attorney by saying "Joe, I'm only looking for the truth, and if you're telling the truth, that's it.  You can handle this by yourself." 384 U.S. at 454-55.[5]

---

[5]*Kyger* was not decided under AEDPA because the petition had been filed prior to 1996. However, this is immaterial because the relevant proposition from *Kyger* is that the statement in question was a clear violation of Supreme Court precedent.  This application of *Miranda* was not affected by the subsequent passage of AEDPA.

The warden concedes that the statement in *Kyger* is similar to the statement by Officer Walker in this case. However, the warden seeks to distinguish the cases on the temporal basis that *Kyger* involved a suspect who had stated that he wanted to speak to an attorney whereas Simpson had not yet requested counsel. We find two faults with the warden's attempt at distinction.

First, *Kyger* expressly stated that the officer's statement was inappropriate even if Kyger had only made an equivocal request for counsel, as opposed to a clear request for counsel. 146 F.3d at 379. Here, though Simpson's statement was certainly not an unequivocal request for counsel, it was at least an equivocal expression that he was considering speaking to counsel. Indeed, that Officer Walker responded with a clarifying statement ("You c-can any-anytime, you can always have an attorney present. It is my understanding that you wanted to take the test.")—which was appropriate under *Davis*, 512 U.S. at 461—shows that Officer Walker thought that Simpson might have been requesting counsel. Thus, because Simpson's statement was an equivocal statement about his desire for counsel, *Kyger* is on all fours.

Second, and more troubling, to accept the warden's distinction would be to accept a rule that police *may not* discourage interviewees from persisting with their request for counsel *after* they have already requested counsel, but *may* preemptively discourage them from seeking the advice of counsel after informing them of the right to counsel but before they actually request counsel. The warden offers no authority, and we are aware of none, endorsing such a strange proposition. In essence, to accept the warden's distinction would be to approve the following alteration of the *Miranda* warnings: "You have the right to an attorney, but you only need to exercise that right if you are guilty or are lying." This would be an unreasonable rule and an unreasonable reading of *Miranda*, which expressly disapproved of such a tactic. *Miranda*, 384 U.S. at 454-55.

Here, Officer Walker indicated to Simpson that he only needed a lawyer if he had lied or intended to lie, and such a tactic is highly likely to taint an interviewee's decision-making calculus. The obvious takeaway from the perspective of someone in

Simpson's position is that, if he requested an attorney, he would be admitting to lying, which would result in his immediately being charged with aggravated murder. Thus, his only other option, as stated by Officer Walker, was to take the polygraph that day without the assistance of counsel.

Framing the issue in this way is inherently coercive and violative of *Miranda*. Furthermore, in so doing, Officer Walker crossed the line from stating the truth to distorting the truth and, arguably, to giving legal advice. Officers run a high risk when they move into the realm of offering advice. It is quite possible that, had Simpson spoken with an attorney, the attorney could have arranged for a polygraph at a later date. Officer Walker essentially advised Simpson to the contrary. As the Fifth Circuit—in a case in which officers responded to an equivocal request for counsel by stating that "an attorney could not relate [the suspect's] story to the police, and [the officer] explained that an attorney would probably advise him to say nothing"—explained:

> [T]he limited inquiry permissible after an equivocal request for legal counsel may not take the form of an argument between interrogators and suspect about whether having counsel would be in the suspect's best interests or not. Nor may it incorporate a presumption by the interrogator to tell the suspect what counsel's advice to him would be if he were present. Such measures are foreign to the purpose of clarification, which is not to persuade but to discern.
>
> . . . .
>
> Officer Cunningham's explanation of the consequences of the suspect's talking to counsel might have been innocuous, even proper, had it been correct. . . . But even such explanations are perilous and, if given, must not be materially incorrect.
>
> Here they were incorrect: it was simply not true, as Thompson was told, that "if he told his attorney he could not tell his side of the story." . . . . The point is that counsel's advice about what is best for the suspect to do is for counsel, not the interrogator, to give. And it is for him to give after consultation with his client and after weighing where the suspect's best interests lie from the point of view of the suspect, not from that of a policeman be he ever so well intentioned. Until this occurs, it is simply impossible to predict what counsel's advice would be; and even if it were, the right to advice of counsel surely is the right to advice from counsel, not from the interrogator.

*Thompson v. Wainwright*, 601 F.2d 768, 769, 772 (5th Cir. 1979).

*Thompson*'s reasoning applies with equal force here. Simpson correctly viewed Officer Walker as having superior knowledge about his circumstances and options. Officer Walker crossed the line separating adversary from advisor when he said that Simpson only needed an attorney if he was lying. Not only was this not true as a matter of legal strategy, as lawyers routinely instruct even innocent clients not to speak with the police, but, even if it were true, it was not Officer Walker's place to give the advice. Thus, because *Miranda* itself expressly disapproved of the tactics used here, as confirmed by *Kyger*,[6] and because the warden's attempt to distinguish *Kyger* is unpersuasive, we find that the state court's admission of the June 20th statement was an unreasonable application of Supreme Court precedent.

**B.        April Statements**

The June statements were preceded by two interrogations in April, on the 24th and the 27th, during which time Simpson was in jail for a separate offense. Acting on a tip that Simpson might have known something about the arson, Detective Kallay and Agent Ozbolt arranged to meet with Simpson in jail. In his April statements, Simpson denied any involvement at all in the arson. He claimed, however, to know that "Pumpkin" Kelly and Leah met the day before the incident. He also claimed that Kelly had called Simpson to request a ride around the time of the fire and that, when he picked Kelly up, Kelly was excited and smelled like gasoline. The officers did not administer *Miranda* warnings at the outset of either interview.

Simpson later moved to suppress both April statements due to the officers' failure to give *Miranda* warnings. The state court overruled the motion on the basis that Simpson was not in "custody" under *Miranda* during the interrogations, so no warnings were required. At trial, the prosecutor introduced the two statements for the purpose of

---

[6]"Although only Supreme Court case law is relevant under the AEDPA in examining what Federal law is 'clearly established,' the decisions of the United States Courts of Appeals may be informative to the extent we have already reviewed and interpreted the relevant Supreme court case law to determine whether a legal principle or right has been clearly established by the Supreme Court." *Hill v. Hoffbauer,* 337 F.3d 706, 716 (6th Cir. 2003).

showing that Simpson had not been truthful with the police in April. The prosecutor sought to show that, because Simpson lied to the officers in April by denying involvement completely, he similarly lied in his June statements when he admitted to only limited involvement. In other words, the prosecutor asked the jury to credit Simpson's June statements up to the point that he implicated himself at all. However, the prosecutor urged the jury not to credit the June statements insofar as Simpson minimized his involvement in the arson, and pointed to the April statements as proof of why the jury should so conclude. The state appellate court affirmed the trial court's ruling, and it further held that any error in admitting the evidence was harmless because the April statements were not inculpatory on their face.

The state court held that, although Simpson was in prison at the time of the April statements, he was not in custody for purposes of *Miranda* and, thus, no warnings were required. In so holding, the state court cited a string of cases from various circuits, primarily the Ninth Circuit's decision in *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978),[7] that have concluded that simply being incarcerated does not, by itself, constitute custody for *Miranda* purposes. Instead, the question under these cases is whether there has been a "change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Id.* at 428. The state court's reliance upon this line of circuit cases was contrary to factually indistinguishable Supreme Court case law, *Mathis v. United States*, 391 U.S. 1 (1968).

In *Mathis*, the Supreme Court addressed the admissibility of statements given without *Miranda* warnings in a case, like this one, in which the individual was in prison

---

[7]We noted the *Cervantes* reasoning with approval in dicta in *United States v. Ozuna*, 170 F.3d 654, 658 n.3 (6th Cir. 1999). However, *Cervantes* deals with a substantially different fact pattern than this case. There, and in almost every other federal circuit court case to have applied *Cervantes*, the prisoner was being questioned about something that happened *in prison*. *E.g. Garcia v. Singletary*, 13 F.3d 1487, 1490-92 (11th Cir. 1994) (prisoner not in *Miranda* custody when prison guard responding to a fire in prisoner's cell asked prisoner "why he set the fire"). *Cervantes* actually distinguished *Mathis* on this basis. 589 F.2d at 427. The only other cases to have applied *Cervantes* did so to find that a prisoner who initiated contact with police was not in *Miranda* custody at the time of the contact. *E.g. Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988) (prisoner not in *Miranda* custody when prisoner called police to discuss a crime). So, while *Cervantes* may be persuasive in cases involving the questioning of prisoners about events that occurred in prison or instances of prisoners initiating contact with police, it is inapposite in cases of the police initiating an interrogation of a prisoner about a completely different offense or something that happened beyond the prison walls. *Mathis* controls in those circumstances.

serving a sentence on an unrelated state crime. *Id.* at 2. The government contended that the statements were admissible because "the petitioner had not been put in jail by the officers questioning him, but was there for an entirely separate offense," *id.* at 4, or, in other words, because the petitioner was not in *Miranda* custody during the interviews. The Supreme Court concluded that this argument was "too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody." *Id.* The Court went on to state that restricting *Miranda* protections to those that are in custody for the case under investigation would go "against the whole purpose of the *Miranda* decision" and that there was "nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody." *Id.* at 4-5. And to punctuate the matter with clarity, the Court stated:

> In speaking of "custody" the language of the *Miranda* opinion is clear and unequivocal: "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized."

*Id.* at 5 (quoting *Miranda*, 384 U.S. at 478). Indeed, in dissent, Justice White objected to the majority's "cavalier" extension of the definition of *Miranda* custody. *Id.* at 7 (White, J., dissenting).

There is no relevant factual distinction between *Mathis* and the circumstances of Simpson's April statements. Quite tellingly, the state court never cited *Mathis*. Here, as in *Mathis*, state agents unaffiliated with the prison isolated an inmate and questioned him about an unrelated incident without first giving *Miranda* warnings. The Supreme Court ruled that such action was improper and that any resulting statements must be

suppressed.**8** As there is no material factual distinction, the April statements were admitted contrary to Supreme Court precedent.

**C.      Harmless Error Analysis**

On collateral review of a state prosecution, a constitutional error will not be deemed harmless if the court concludes that it "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007). If the court finds itself with grave doubt as to the effect of an error, the error was not harmless. *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008) (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

In this case, as the Ohio Court of Appeals noted, Simpson's statements were, by far, the most damning evidence against him. *Simpson*, 2002 Ohio App. LEXIS 3785, at *13 ("Without question, the most incriminating evidence presented against appellant at trial were his own statements.") There was no physical evidence or eyewitness linking him to the arson. Aside from his statements, only two other pieces of evidence potentially implicated Simpson:  (1) a sheriff's deputy at the local jail testified that he overheard Simpson ask "why didn't they charge the bitch too.  It was her idea to start the fire."; and (2) an inmate from a cell next to Simpson testified that Simpson told him that

---

**8**We note that the Supreme Court recently made clear that an inmate in Simpson's situation is in *Miranda* custody when he is being questioned by authorities on an unrelated crime.  In *Maryland v. Shatzer*, __ U.S. __, 130 S. Ct. 1213 (2010), the Court addressed the question of when, if ever, may the police re-initiate contact with a suspect after he has invoked his right to counsel.  Like Simpson, Shatzer was in jail.  Officers came to the jail and sought to question him about an unrelated offense, and he invoked his right to counsel.  The interview ceased and Shatzer was returned to the prison population.  Two and one half years later, another officer came back to the jail and sought again to question Shatzer about the crime.  This time, he waived his *Miranda* rights and made incriminating statements.  He later sought to suppress his statement on the basis that he had never left *Miranda* custody after the first interview and, thus, police improperly re-initiated interrogation in violation of *Edwards*.  The Supreme Court disagreed, holding that there had been a break in *Miranda* custody once Shatzer had been returned to the general prison population.

But, in the process of making this holding, the Supreme Court stated that "[n]o one questions that Shatzer was in custody for *Miranda* purposes during the interviews" with officers while in jail.  130 S. Ct. at 1224.  And in holding that the period of time between the two interviews, but during which Shatzer remained incarcerated on the unrelated offense, did not constitute *Miranda* custody, the Court stated, "[w]e distinguish the duration of incarceration from the duration of what might be termed interrogative custody. When a prisoner is removed from the general prison population and taken to a separate location for questioning, the duration of *that separation* is assuredly dependent upon his interrogators" such that the period of "interrogative custody" constitutes *Miranda* custody.  *Id.* at 1225 n.8 (emphasis in original). Though not controlling because *Shatzer* post-dates the state court's decision in Simpson's case, it is clear that the Supreme Court would find that Simpson's April interviews occurred while he was in *Miranda* custody.

there were three people involved in the fire, he was one of them, and that they used Molotov cocktails. (A2249).

As set forth above, we have found that both April statements and the June 20th statements were admitted in violation of *Miranda* and its progeny, but that the June 16th statement was properly admitted against Simpson. In light of the strong role that the statements played in both the State's presentation of the case and the evidence against Simpson, we believe it beyond question that the errors were not harmless, at least as to some of the convictions against Simpson.

The June 20th statement was, for lack of a better description, all over the place. Simpson never actually took the polygraph, but spoke at length with the man who would be the polygraph examiner. At one point, he retracted his admissions of June 16th, returning to the position he took in April that he was not involved at all. However, after further pressure from Kallay and Ozbolt, Simpson admitted to being even more involved than he had admitted in his June 16th statement. He admitted: (1) to hearing Leah and Kelly discuss the arson one week before it happened (A638-39); (2) that, on the day of the arson, he heard Leah tell Kelly that she wanted the house "blown up" (A632); and (3) that he heard Leah tell Kelly how to make a Molotov cocktail (A642-44). Simpson's admissions on June 20th were, by far, the strongest evidence of not only his involvement in the arson, but also the *extent* of his knowledge and involvement before, during, and after the arson.

However, even in the June 20th statement, Simpson still maintained that he had not been involved in the planning of the arson or in making the Molotov cocktails, and had no intent to kill anyone. Thus, to prove that Simpson acted with the purpose of causing the death of another, the State needed something more than Simpson's own admissions. Creatively, the State turned to Simpson's April denials to prove this element.

The state court found the April statements to be harmless for the simple reason that they were not facially inculpatory. However, this misses the point. Again, *Kyger* is instructive:

The state appeals court and the district court . . . held that the error of admitting Kyger's November 14 statements was harmless because the statements were exculpatory. The state continues to make this argument. Their argument is that the admission of these statements was not only *not* prejudicial to Kyger, it was *helpful* to him. We are unpersuaded by this argument. We know better than to think that the prosecution admitted evidence and emphasized it in its opening and closing statements purely out of such a benign motive. Kyger's statements contradicted hard physical evidence and made him look like a liar. As the Second Circuit has noted:

> A defendant's false exculpatory statement is admissible at trial to show his consciousness of guilt and may be an important part of the government's proof. If the statement was taken in violation of the defendant's constitutional rights, the fact that it was meant to exculpate does not make it any less subject to suppression.

*Kyger*, 146 F.3d at 381 n.3 (emphasis in original) (quoting *United States v. Quiroz*, 13 F.3d 505, 510 (2d Cir. 1993) (citations omitted));[9] *see also Innis*, 446 U.S. at 301 n.5 ("By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.") (emphasis in original); *Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, *whether exculpatory or inculpatory*, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.") (emphasis added). The *Kyger* concurrence echoed this sentiment:

> Kyger's comments during the interrogation were in my opinion highly inculpatory because they showed, in light of the real facts, that he was lying. The prosecution took full advantage of these lies at trial, repeatedly juxtaposing what Kyger told the police with what the physical evidence actually showed.

---

[9] The *Kyger* majority ultimately found harmless error because the unconstitutionally obtained false exculpatory statement—that Kyger had not fired a gun on the night in question—was identical to a subsequent, constitutionally obtained statement made several days later and was contradicted by a parafin test showing that Kyger had, in fact, fired a weapon that night. *Kyger*, 146 F.3d at 382 & n.4.

*Kyger*, 146 F.3d at 383-84 (Merritt, J., concurring). Accordingly, it is well-established that the April statements were not harmless merely because they were facially exculpatory.

The warden argues that the June statements and the other evidence are sufficient to convict Simpson for the crimes of which he was charged—he had admitted to seeing Kelly make the Molotov cocktails, vaguely knowing that Kelly and Leah had a problem with Aleta Bell, driving the car when Kelly got out with the Molotov cocktails, and driving the car away when Kelly returned. However, the warden makes this argument under the assumption that both June statements were properly admitted, whereas we have already concluded that the June 20th statement should have been suppressed. In any event, Simpson contends that, regardless of the other evidence, the admission of the April statements made him appear to the jury to be a liar, thus casting heavy doubt on the full truth of his June statements. This was specifically harmful, Simpson claims, with regard to the charges of aggravated murder, murder, and the five counts of attempted murder, which the jury was instructed were specific intent crimes, meaning that Simpson must have acted with the purpose of causing death as opposed to merely knowing that death was a likely result. (A926-34.) Purpose was defined for the jury as requiring proof of a "conscious objective of producing the specific result," here "a specific intention to purposely cause the death of another." (A928-29.) Simpson contends that, if the jury had not found the purpose element to have been proven, it would have acquitted him of all the murder and attempted murder counts. We agree.

The State offered no direct evidence that it was Simpson's purpose to kill anyone as, even in his most revealing statement of June 20th, Simpson had specifically denied knowing that Kelly intended to blow up the house. (A679.) Instead, the State introduced evidence tending to establish Kelly's purpose to kill Aleta Bell[10] and asked that the jury infer that Simpson shared this intent. Thus, whether the jury was willing to make this inference depended, in large part, on whether the jury believed Simpson's

---

[10]Though not especially relevant because the trials were separate, it is interesting to note that Kelly, who had not given any material statements to the police, was acquitted by a jury of all charges having as an element the specific intent to cause the death of another.

June statements admitting to participation but disclaiming knowledge or purpose. In other words, the strength of the inference depended upon the jury's appraisal of Simpson's credibility. As Simpson correctly notes, the jury deliberated for a long period of time—approximately 28 hours over three days—and, a few hours before reaching a verdict, asked whether there was difference between "purposely caused the death" and "purposeful killing," (A994), indicating that the jury was wrestling with the concept of purpose.

At oral argument, counsel for the warden conceded, as the record reflects, that the State's only evidence in support of its theory that Simpson shared Kelly's intent and purpose was based on an adverse credibility finding as to Simpson. Nevertheless, the warden contends that, even if the April statements are taken out of the picture, there was still enough evidence to show that Simpson was a liar. The warden points to a lie that Simpson told the officers as to Kelly's whereabouts, but this was only marginally relevant, if at all, as it does not concern the extent of Simpson's involvement in the crime and, at trial, this statement was not played to the jury because the prosecutor did not believe it "added anything." (A267.) Thus, the jury likely did not rely upon this lie to make its adverse credibility determination.

The warden also points out that, in his June 20th statement, Simpson at one point reverted back to claiming no involvement at all in the arson. But, as we have now found, the June 20th statement was inadmissible, so the warden may not rely upon that statement for purposes of an adverse credibility determination. Furthermore, saying that the jury could have made an adverse credibility determination based solely on the June statements goes against the weight of how matters progressed at trial. The June interviews themselves, which were played to the jury, contained many statements by the officers accusing Simpson of lying in his April statements. (A446, 484, 517, 561.) Furthermore, the prosecutor emphasized this point in his questioning of the officers before the jury. (A326, 328, 332 ("Were you always concerned that he might have minimized his involvement based upon his minimization or denial of involvement in his prior interviews?").)

In sum, although the jury perhaps *could* have made the requisite adverse credibility determination notwithstanding the April interviews, it is much more likely that the jury did not in fact do so in light of the heavy emphasis placed by the officers and the prosecution on the April lies. We therefore hold that the admission of the April statements was not harmless as to those convictions that required as an essential element a specific intent to cause the death of another—aggravated murder, murder, and attempted murder. This finding is reinforced when the error in admitting the April statements is combined with the error in admitting the June 20th statement. When viewed together, these statements show a person who initially denied any involvement but who then steadily admitted to more involvement with each subsequent interview. A juror faced with this progression of successive revelations of deeper involvement would not have very far to extrapolate from Simpson's June 20th admissions to the State's theory of purpose. Remove the April statements and the June 20th statement, however, and this juror would have to make a rather blind leap to infer the State's theory of purpose based solely on the June 16th statement.

However, though we find the errors not harmless as to the specific intent crimes, the same does not hold true for the general intent convictions of aggravated arson and five counts of felonious assault. This is so because Simpson's June 16th statement was properly introduced against him. His admissions in that statement, standing alone, would be more than adequate to allow a reasonable juror to convict on the general intent crimes. Simpson, therefore, is not entitled to relief as to those convictions. Accordingly, we grant in part and deny in part Simpson's request for a writ of habeas corpus. Simpson's convictions of aggravated murder, murder, and attempted murder are void. Simpson must still serve the remainder of the sentence imposed on his convictions for aggravated arson and felonious assault.[11]

---

[11]Based on our review of the amended Judgment Entry (A1016-19), it appears that Simpson's revised sentence will be seventeen years—eight years on each felonious assault conviction run concurrently to each other, plus nine years on the aggravated arson conviction to run consecutively. However, we leave it to the Ohio authorities to properly recalculate Simpson's remaining sentence.

**IV.**

For the reasons set forth above, we **GRANT IN PART** and **DENY IN PART** Simpson's petition for writ of habeas corpus and **REMAND** to the district court for proceedings consistent with this opinion.

---

## DISSENTING IN PART AND CONCURRING IN PART

---

HELENE N. WHITE, Circuit Judge, dissenting in part, concurring in part. I concur in the majority opinion except with regard to the June 16th statement. I would grant habeas relief as to this statement as well.

I agree with the majority that when Simpson made the statement, "Mmmm-mmmm. I ain't done—nah—I messed up last time I did that," giving two variations of the word "no," along with accompanying negative body language, and then followed up with the statement that "it [couldn't] help," he unequivocally invoked his *Miranda* rights.[1] I do not agree, however, that it was permissible for the officers to later "circle[] back to the *Miranda* issue." (Opinion at 12.)

The majority bases its conclusion on three rationales: 1) *Miranda* rights only apply to interrogation, and here the officers did not ask Simpson any "material questions" until they "revisited" whether he wished to waive his *Miranda* rights, after which Simpson consented; 2) an officer may follow up with "clarifying questions" after an invocation of rights is ambiguous, *see Davis v. United States*, 512 U.S. 452, 461 (1994); and 3) a suspect's voluntary, unsolicited statements after an invocation of *Miranda* rights need not be excluded, *see Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981). I disagree. Because Simpson's invocation of his right to remain silent (or more

---

[1]The relevant exchange on June 16th took place over the course of about six minutes:

Officer:        You willing to waive your rights, and continue talking to us?
Simpson:     Mmmm-mmmm. I ain't done—nah—I messed up last time I did that.
                    (with dismissive wave of his hand and slight shake of his head)
Officer:        So, you don't want to talk to us? You do or don't want to talk to us?
Simpson:     I mean … it can't help…
Officer:        … mmm-hmm …
Simpson:     you know what I mean…
                    (silence)
Officer:        Well, it's up to you, whatever you want to talk to us or not. We're not
                    going to twist your arm or anything like that.
Simpson:     What y'all want to talk about?
Officer:        Just basically what we're talking about now.

The conversation continued, and a few minutes later the Officer asked: "So, are you gonna talk to us about any of this or not?" Simpson responded "I guess" and eventually signed a waiver form.

precisely, his declination of the invitation to waive the right) was unequivocal, I find *Davis* distinguishable and *Smith v. Illinois*, 469 U.S. 91 (1984), controlling, and conclude that the continued questioning after Simpson's invocation of his rights was unconstitutional.

Although *Davis* holds that police may constitutionally pose clarifying questions after an equivocal or ambiguous invocation of rights, *Smith* makes clear that where the invocation is not ambiguous, clarification is unnecessary and questioning must cease. *Smith* involved the following exchange:[2]

| | |
|---|---|
| [Officer]: | If you do want to talk to me I must advise you that whatever you say can and will be used against you in court. Do you understand that? |
| [Smith]: | Yeah. |
| [Officer]: | You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that? |
| [Smith]: | *Uh, yeah. I'd like to do that.* |
| [Officer]: | Okay.<br>[] |
| [Officer]: | . . . If you want a lawyer and you're unable to pay for one a lawyer will be appointed to represent you free of cost, do you understand that? |
| [Smith]: | Okay. |
| [Officer]: | Do you wish to talk to me at this time without a lawyer being present? |
| [Smith]: | *Yeah and no, uh, I don't know what's what, really.* |
| [Officer]: | *Well. You either have [to agree] to talk to me this time without a lawyer being present* and if you do agree to talk with me without a lawyer being present you can stop at any time you want to. |
| [Smith]: | All right. I'll talk to you then. |

*See* 469 U.S. at 93 (emphasis in original).

---

[2]It makes no difference that *Smith* concerned a request for counsel and this case involves the right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. ---, 130 S. Ct. 2250, 2260 (2010) (standard the same for determining when a defendant has invoked right to remain silent and when a defendant has invoked right to counsel at issue in *Davis*).

The *Smith* majority held that the unambiguous invocation could not be rendered ambiguous by continued questioning.

> The courts below were able to construe Smith's request for counsel as "ambiguous" *only* by looking to Smith's *subsequent* responses to continued police questioning and by concluding that, "considered in total," Smith's " *statements*" were equivocal. 102 Ill.2d, at 373, 80 Ill.Dec., at 792, 466 N.E.2d, at 240 (emphasis added); *see also* 113 Ill.App.3d, at 310, 69 Ill.Dec., at 342, 447 N.E.2d, at 559. This line of analysis is unprecedented and untenable. As Justice Simon emphasized below, "[a] statement either is such an assertion [of the right to counsel] or it is not." 102 Ill.2d, at 375, 80 Ill.Dec., at 789, 466 N.E.2d, at 241. Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

469 U.S. at 97-98 (footnote omitted) (emphasis in original). Although *Smith* was a narrow ruling, its limitations correspond to the instant circumstances:

> Our decision is a narrow one. We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such ambiguity or equivocation. We hold only that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver.

*Id*. at 99-100. It is not contended that events or nuances preceding Simpson's initial refusal to waive his rights rendered the refusal equivocal. Because Simpson's refusal was unequivocal, like Smith's and unlike Davis', there was no ambiguity necessitating clarifying questions, and Simpson's subsequent responses cannot retrospectively render his earlier invocation equivocal.

*Smith* also makes clear that it is irrelevant whether further questioning seeks "clarifying" or "material" information. The post-invocation-of-rights questions in *Smith*

were also not "material." In fact, the officer simply continued giving Smith his *Miranda* rights. Yet, the continued questions constituted impermissible "police-initiated custodial interrogation." *Smith*, 469 U.S. at 98.

Lastly, I reject the notion that although Simpson initially invoked his rights, he moments later validly waived that invocation. *Smith* was decided three years after *Edwards* and did not view Smith's subsequent responses as a waiver of his previously invoked right. Rather, the *Smith* Court reaffirmed the importance of *Edwards*' prohibition of continued questioning:

> An accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," unless he validly waives his earlier request for the assistance of counsel. *Edwards v. Arizona*, 451 U.S., at 484-485, 101 S. Ct., at 1885. This "rigid" prophylactic rule, *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S. Ct. 2560, 2569, 61 L. Ed. 2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. *See*, *e.g.*, *Edwards v. Arizona, supra,* 451 U.S., at 484-485, 101 S. Ct., at 1884-1885 (whether accused "expressed his desire" for, or "clearly asserted" his right to, the assistance of counsel); *Miranda v. Arizona,* 384 U.S., at 444-445, 86 S. Ct., at 1612 (whether accused "indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking"). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona, supra*, 451 U.S., at 485, 486, n. 9, 101 S. Ct., at 1885, n. 9.

469 U.S. at 94-95 (footnote omitted). In stressing the distinction between the questions whether the right was invoked and whether it was subsequently waived, the Court explained:

> The importance of keeping the two inquiries distinct is manifest. *Edwards* set forth a "bright-line rule" that *all* questioning must cease after an accused requests counsel. *Solem v. Stumes*, 465 U.S. 638, 646, 104 S. Ct. 1338, 1343, 79 L. Ed. 2d 579 (1984). In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"–explicit or subtle, deliberate or unintentional– might

otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 2834, 77 L. Ed. 2d 405 (1983); *Fare v. Michael C.*, 442 U.S., at 719, 99 S. Ct., at 2568.   With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." *Edwards v. Arizona,* 451 U.S., at 484, 101 S. Ct., at 1885.

*Id*. at 98-99; *see also White v. Finkbeiner*, 611 F.2d 186, 193 (7th Cir. 1979) (vacated on other grounds) ("Courts have viewed a waiver which follows soon after the initial request as suspect.").[3]

Simpson's responses to subsequent questioning did not constitute a knowing and intelligent waiver of his previously invoked right to remain silent, and it cannot fairly be said that he "initiated further discussions with the police" after questioning had ceased in response to his invoking his rights.

The writ should be granted with respect to all four statements.

---

[3]*White*, a pre-*Edwards* case that concluded that *Miranda* did not prohibit authorities from initiating renewed questioning after the suspect requested an attorney, was of course vacated in light of *Edwards*.  However, because the state must show that a waiver was knowing, intelligent, and voluntary in order to be valid, *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010), the *White* court's observation that a waiver immediately following an attorney request is suspicious remains an intuitive and logical point.