**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0292n.06

No. 15-3260

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 02, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DONOVAN SIMPSON, | ) | |
| | ) | |
| **Petitioner-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| WARDEN, WARREN CORRECTIONAL | ) | |
| INSTITUTION, | ) | |
| | ) | **OPINION** |
| **Respondent-Appellant.** | ) | |
| | ) | |

Before: DAUGHTREY, MOORE, and GRIFFIN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** In *Simpson v. Jackson*, 615 F.3d 421 (6th Cir. 2010), *cert. granted, judgment vacated sub nom. Sheets v. Simpson*, 132 S. Ct. 1632 (2012), this court granted in part Donovan Simpson's 28 U.S.C. § 2254 petition, holding that three statements Simpson gave to law-enforcement officials investigating a deadly arson were obtained in violation of *Miranda*. Simpson gave two of those statements while he was incarcerated for an unrelated offense; he gave the third statement in a police station while out on a recognizance bond. Because the original panel determined that the trial court's admission of those three statements was not harmless error, it vacated Simpson's convictions for the three most serious crimes of which he was found guilty: aggravated murder, murder, and attempted murder. The Warden sought certiorari.

In 2012, the Supreme Court decided *Howes v. Fields*, 132 S. Ct. 1181 (2012), reversing this court's habeas grant to a prisoner who claimed that his jailhouse confession was obtained in violation of *Miranda*. Shortly thereafter, the Supreme Court granted the Warden's petition for certiorari in Simpson's case, vacated the *Simpson* panel's judgment, and remanded Simpson's case for reconsideration in light of *Howes*. After we then remanded to the district court for reconsideration, the district court determined that *Howes* did not affect the outcome of Simpson's case, and issued a partial habeas grant consistent with the 2010 panel's opinion. For the reasons set forth below, we **AFFIRM**.

## I. FACTS AND PROCEDURE

### A. Facts

#### 1. The fire at 151 South Wheatland Avenue.

On October 27, 1997, 151 South Wheatland Avenue in Columbus, Ohio caught fire. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 2) (Page ID #808). Six people were inside the house: Aleta Bell; three of Bell's children—Shenequa (five years old), Elijah (three years old), and Myesha (five months); and two men, Terrance Hall and Gary Williams. Hall woke up to the sound of crashing glass; the fire spread quickly. Bell, Myesha, Hall, and Williams escaped, but Elijah was seriously injured, and Shenequa died from her injuries. The Columbus Fire Department determined that the fire started when someone threw a Molotov cocktail through the home's living-room window. *Id.* ¶¶ 5–7 (Page ID #810–11).

### 2. Simpson makes four statements to law enforcement in April and June 2000.

Columbus Police Department Detective Edward Kallay, Jr. led the investigation into the 151 South Wheatland fire. *Id.* ¶ 8 (Page ID #811). In January 2000, informant Adiyat Diggs told Kallay that Simpson "might have information" about the crime. *Id.*; R. 79-1 (Trial Tr. (Kallay) at 105:24–106:7) (Page ID #1236–37). Kallay and other law-enforcement officers interviewed Simpson on four dates: April 24, April 27, June 16, and June 20, 2000.

### a. Simpson's April 24, 2000 statement.

Kallay and Federal Special Agent Dan Ozbolt interviewed Simpson at the Southeastern Correctional Center in Lancaster, Ohio, where Simpson was then incarcerated. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 8) (Page ID #811); R. 79-1 (Trial Tr. (Kallay) at 107:7–14) (Page ID #1238). Guards took Simpson from the prison's general population and brought him to a conference room in the prison warden's office. *Simpson*, 615 F.3d at 426–27. Kallay and Ozbolt recorded the interrogation. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 8) (Page ID #811).

Kallay and Ozbolt did not Mirandize Simpson on April 24. *Id.* ¶ 4 (Page ID #809). They "accused Simpson of being with" Daryl Kelly—whom the officers considered a suspect—"at the time of the incident." *Simpson*, 615 F.3d at 427; R. 79-1 (Trial Tr. (Kallay) at 109:3–7) (Page ID #1240). However, nothing Simpson told Kallay and Ozbolt on April 24 led them to consider Simpson a suspect. R. 79-1 (Trial Tr. (Kallay) at 109:11–16) (Page ID #1240).

Simpson told Kallay and Ozbolt that he met up with Kelly the day before and the day of the fire. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 9) (Page ID #811–12). The day before the fire,

Simpson drove Kelly to a bar, where Kelly met with a woman named Leah Smith. *Id.* A few months before the fire, Smith got into a dispute with Bell, broke into Bell's half of the building, and was ultimately convicted of burglary. *Id.* ¶ 9 n.1 (Page ID #812–813). Simpson didn't enter the bar that night; when Kelly and Smith exited, Simpson overheard Smith "tell Kelly to 'take care of this for [her].'" *Id.* ¶ 9 (Page ID #812).

Simpson recounted that the next day (the day of the fire), Kelly called Simpson and asked for another ride. *Id.*; R. 79-1 (Trial Tr. (Kallay) at 109:22–110:1) (Page ID #1240–41). Simpson told Kallay and Ozbolt that he smelled gasoline on Kelly when he picked him up. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 9) (Page ID #812).

Simpson's April 24 interview lasted just under an hour. *Id.* ¶ 24 (Page ID #818). During the interview, Kallay and Ozbalt told Simpson that they could get him released from prison if he cooperated with them. R. 79-1 (Trial Tr. (Kallay) at 136:11–24) (Page ID #1267). Simpson had four to six months left on his sentence, and had a release application pending before the Licking County Common Pleas Court. *Id.* at 135:21–136:1 (Page ID #1266–67); R. 79-12 (Trial Tr. (Kallay) at 28:8–12) (Page ID #3510). Simpson had also just fathered a child. R. 79-1 (Trial Tr. (Kallay) at 136:2–10) (Page ID #1267). The officers promised Simpson that they would secure his release from prison if he helped them with the arson investigation. *Id.* at 136:25–137:6 (Page ID #1267–68).

### b. Simpson's April 27, 2000 statement.

Kallay and Ozbolt returned to the Southeastern Correctional Center to interview Simpson on April 27. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 10) (Page ID #812). Simpson was then in the infirmary. *Simpson*, 615 F.3d at 427. Once again, Kallay and Ozbolt did not Mirandize Simpson. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 4) (Page ID #809). During this interview— which lasted about half an hour—Simpson reiterated what he had told Kallay and Ozbolt on April 24: that Smith and Kelly were involved in setting the fire at 151 South Wheatland. *Id.* ¶¶ 9, 24 (Page ID #812, 818); R. 79-1 (Trial Tr. (Kallay) at 117:4–6) (Page ID #1248).

Kallay and Ozbolt followed through on their April 24 promise. The officers obtained a recognizance bond for Simpson, and Simpson was released from prison on probation. R. 79-12 (Trial Tr. (Kallay) at 29:3–30:11) (Page ID #3511–12). In exchange, Simpson agreed to help the officers with their investigation. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 10) (Page ID #812).

### c. Simpson's June 16, 2000 statement.

Simpson did not cooperate with the arson investigation. R. 79-12 (Trial Tr. (Kallay) at 32:12–21) (Page ID #3514). Kallay arrested Simpson on June 16 for violating the terms of his probation, and subsequently brought Simpson to a Columbus police station for a videotaped interview. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶¶ 10–11) (Page ID #812).

Ozbolt gave Simpson a "*Miranda* rights waiver form," which Simpson signed. *Id.* ¶ 4 (Page ID #810); R. 79-1 (Trial Tr. (Kallay) at 141:23–142:7) (Page ID #1272–73). Kallay told Simpson that because he had failed to report on his recognizance bond, he could be charged with

5

a felony. R. 79-11 (Trial Tr. (6/16/00 Recording) 42:11–21) (Page ID #3180). Then Kallay started pressing Simpson on his April statements. *Id.* at 44:16–23 (Page ID #3182). At first, Simpson maintained that he wasn't involved with the arson, *id.* at 44:23–45:3 (Page ID #3182–83), but Kallay pushed harder, *id.* at 45:11–25, 47:11–15, 50:3–10 (Page ID #3183, 3185, 3188). Ozbolt counseled Simpson to tell the truth, but added that Kelly and Smith were the prime suspects. *Id.* at 48:7–10 (Page ID #3186).

Simpson relented; he told Kallay and Ozbolt that he was more involved with the arson than he had initially let on. The day before the fire, Smith asked Simpson if he could drive Kelly somewhere that evening. *Id.* at 64:14–65:3 (Page ID #3202–03). Simpson was high on crack cocaine; Smith gave him more crack in exchange for driving Kelly. *Id.* at 64:6–11, 65:8–13 (Page ID #3202–03). That night, Simpson and Kelly bought two fifths of alcohol, *id.* at 68:18–23, 70:7–8 (Page ID #3206, 3208), and they drove around Columbus drinking, *id.* at 70:10–16 (Page ID #3208). Eventually, Simpson parked in front of a house which Kelly entered, but Simpson stayed in the car. *Id.* at 70:20–71:9 (Page ID #3208–09). When Kelly emerged, he was carrying the two alcohol bottles, filled with gasoline. *Id.* at 71:9–17 (Page ID #3209).[1]

Kelly told Simpson to drive to South Wheatland Avenue. *Id.* at 76:11–17 (Page ID #3214). On the way over, Kelly grabbed a towel from the backseat of the car and started tearing

---

[1]The Ohio Court of Appeals summarized Simpson's June 16 statement as follows: "Kelly and appellant took two empty bottles of alcohol and filled them with gasoline. They brought the bottles to [Smith] who showed them how to make a Molotov cocktail." R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 11) (Page ID #812–13). As Simpson notes in his brief, that summary is wrong: on June 16, Simpson told Kallay and Ozbolt that *Kelly* filled the two bottles. Appellee Br. at 11 n.1.

it into strips. *Id.* at 76:17–23 (Page ID #3214). Kelly told Simpson that he was "gonna blow that bitch up." *Id.* at 76:24–25 (Page ID #3214).

Simpson drove to an alley behind 151 South Wheatland, *id.* at 79:21–22 (Page ID #3217), where he smoked more crack with Kelly, *id.* at 79:24–25 (Page ID #3217). Kelly exited the car carrying the two gasoline-filled bottles and told Simpson to meet him at a nearby corner in ten seconds. *Id.* at 82:25–83:12 (Page ID #3220–21). As Simpson headed to the corner, he heard the sound of glass shattering. *Id.* at 83:25–84:2 (Page ID #3221–22).

Simpson told Kallay and Ozbolt that he didn't know what Kelly and Smith were planning—even up to the point when Simpson drove to South Wheatland. *Id.* at 78:12–23, 81:22–25, 83:15–24 (Page ID #3216, 3219, 3221). Kallay told Simpson that he would bring him in for a polygraph in a few days. *Id.* at 138:1–8 (Page ID #3276). If Simpson passed the test, Kallay said he would reinstate Simpson's recognizance bond, assuming Simpson cooperated with the arson investigation. *Id.* at 138:8–10 (Page ID #3276). If Simpson failed or didn't cooperate, Kallay threatened to charge him with complicity to commit aggravated murder. *Id.* at 138:10–139:2 (Page ID #3276–77).

#### d.  Simpson's June 20, 2000 statement.

Simpson returned to the Columbus police station on June 20. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 12) (Page ID #813). This time, Kallay and Ozbolt were joined by Randy Walker, a polygrapher with the Columbus Police Department. R. 79-11 (Trial Tr. (6/20/00 Recording) at

7

160:1–8) (Page ID #3298). This final interview was videotaped. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 13) (Page ID #813).

The officers pressured Simpson from the start of the interview. Kallay told Simpson that if he didn't cooperate, Simpson would "eat the whole thing . . . agg murder—conspiracy to commit." R. 79-11 (Trial Tr. (6/20/00 Recording) at 160:19–22) (Page ID #3298). Kallay assured Simpson that he was "not the one we want," but still threatened to arrest Simpson for complicity to commit aggravated murder if he didn't take the polygraph. *Id.* at 164:13–17 (Page ID #3302).

Walker gave Simpson a *Miranda* waiver form and talked about Simpson's right to counsel. *Id.* at 173:21–174:23 (Page ID #3311–12). Simpson seemed surprised. He asked Walker: "Oh, I can have an attorney present?" *Id.* at 174:24–25 (Page ID #3312). Walker said that Simpson could. *Id.* at 175:1–3 (Page ID #3313). The two had the following exchange:

> WALKER: [D]o you follow what I'm sayin'? That's . . . i-i-if you're telling me the truth, then you won't have a problem with the test. If you're lying, then, uh, yea, if I was lying, I probably would, I'd probably get an attorney, I probably wouldn't take the test.
>
> SIMPSON: Oh.
>
> WALKER: Yea, well, that's me. But that's a decision that, yea, you know, you have to make. This part of the form is wordy and is—is lengthy. What this says is, that you are giving me permission to give you the exam.

*Id.* at 177:17–178:3 (Page ID #3315–16).

Simpson didn't take the polygraph test. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 12) (Page ID #813). He did, however, admit that he knew about Smith and Kelly's plans before the night

of the fire. At first, Simpson backpedaled: he told the officers that he "had nothing to do with" the arson. R. 79-11 (Trial Tr. (6/20/00 Recording) at 216:9–10 (Page ID #3354). Simpson said that his June 16 statement was a lie—that he had told Ozbolt and Kallay that he was involved with the fire only because they weren't "gonna take nothing else for an answer." *Id.* 216:15–18 (Page ID #3354). Simpson added that he wanted to take the polygraph to prove his innocence. *Id.* at 216:21–217:2 (Page ID #3354–55).

The officers pushed back hard. Walker suggested that an eyewitness may have seen Simpson at 151 South Wheatland around the time of the fire. *Id.* at 244:1–6 (Page ID #3381). Simpson started crying. *Id.* at 256:12 (Page ID #3393). Kallay told Simpson that if he didn't tell the complete story of the arson, the officers would cut a deal with Kelly. *Id.* at 268:15–20 (Page ID #3405). Simpson asked the officers: "Is this a wise thing to do without my lawyer, is this a wise thing to do?" *Id.* at 273:1–2 (Page ID #3410). Kallay responded: "[H]ow are we supposed to answer that?" *Id.* at 273:3–4 (Page ID #3410).

Eventually, Simpson gave in. Simpson made three major admissions on June 20—he told the officers:

1. That he had heard Smith "and Kelly discuss the arson one week before it happened";

2. "[T]hat, on the day of the arson, he heard [Smith] tell Kelly that she wanted the house 'blown up'"; and

3. "[T]hat he heard [Smith] tell Kelly how to make a Molotov cocktail."

9

*Simpson*, 615 F.3d at 442. Nonetheless, "Simpson still maintained that he had not been involved in the planning of the arson or in making the Molotov cocktails, and had no intent to kill anyone." *Id.*

## B. Procedural History

### 1. Simpson is tried, convicted, and sentenced to ninety years in prison.

The State of Ohio indicted Simpson on August 24, 2000, charging him with thirteen counts:

1. Two counts of aggravated murder (Ohio Rev. Code § 2903.01) for killing Shenequa Bell, both of which "contained death penalty specifications" (Ohio Rev. Code § 2929.04(A));

2. Five counts of attempted murder (Ohio Rev. Code §§ 2903.02 and 2923.02);

3. One aggravated arson count (Ohio Rev. Code § 2909.02); and

4. Five felonious assault counts (Ohio Rev. Code § 2903.11)

R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 3) (Page ID #809). Under Ohio law, aggravated murder, murder (a lesser-included offense of which Simpson was convicted), and attempted murder are specific-intent crimes: they require a finding of purpose. Ohio Rev. Code §§ 2903.01(A), 2903.02(A), 2923.02(A); *see Simpson*, 615 F.3d at 443–44. Aggravated arson and felonious assault are general-intent crimes: they do not require proof of purpose. Ohio Rev. Code §§ 2903.11, 2909.02; *see Simpson*, 615 F.3d at 445. Simpson pleaded not guilty to all of the counts against him. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 3) (Page ID #809).

Before trial, Simpson moved to suppress the four statements he made in April and June 2000. *Id.* ¶ 4 (Page ID #809). The trial court held a hearing and denied Simpson's suppression motion. *Id.* (Page ID #809–10).

"Without question, the most incriminating evidence presented against [Simpson] at trial were his own statements." *Id.* ¶ 19 (Page ID #816). No physical evidence tied Simpson to the arson; no eyewitnesses testified that Simpson was involved. *Simpson*, 615 F.3d at 442. The jury did, however, hear the tapes of Simpson's April 24 and April 27 statements and watch the videos of his June 16 and June 20 confessions. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 13) (Page ID #813). Just "two other pieces of evidence potentially implicated Simpson":

1. [A] sheriff's deputy at the local jail testified that he overheard Simpson ask "why didn't they charge the bitch too. It was her idea to start the fire."; and

2. [A]n inmate from a cell next to Simpson testified that Simpson told him that there were three people involved in the fire, he was one of them, and that they used Molotov cocktails.

*Simpson*, 615 F.3d at 442.

The recordings of Simpson's statements plainly made an impact on the jury. During deliberations, the jury asked to hear the parts of the audiotapes and videos "that relate[d] to [the] planning of the fire." R. 79-13 (Trial Tr. at 144:2–5) (Page ID #3864). The court played both videos a second time. *Id.* at 144:19–24 (Page ID #3864). And the jury focused intently on the issue of "purpose": the jurors asked the trial court a question about the definition of purpose before reaching a verdict. *Id.* at 157:1–7 (Page ID #3877).

11

After twenty-eight hours of deliberations, the jury convicted Simpson "of all five counts of attempted murder and felonious assault, . . . one count of aggravated arson, . . . the lesser included offense of murder of Shenequa Bell, and . . . the aggravated felony-murder of Shenequa Bell." R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 16) (Page ID #814); *see Simpson*, 615 F.3d at 444. The jury also returned a death-penalty specification for the aggravated-murder count. R. 78-1 (7/23/02 Ohio Ct. App. Op. ¶ 16) (Page ID #814). After a mitigation hearing, a jury voted to sentence Simpson to life in prison. *Id.* ¶ 17 (Page ID #814). The trial court ultimately sentenced Simpson to ninety years' imprisonment. *Id.*

### 2. The Ohio Court of Appeals upholds Simpson's sentence but remands his case for resentencing.

The Ohio Court of Appeals sustained Simpson's convictions. *Id.* ¶ 86 (Page ID #840). It held that Simpson "was not in custody" for *Miranda* purposes when he gave his April 24 and April 27 statements. *Id.* ¶ 25 (Page ID #819). Even if he had been in custody, the court added, any error in admitting those two statements was harmless. *Id.* ¶ 26 (Page ID #819).

As for the June confessions, the state court of appeals held that both were voluntary. *Id.* ¶¶ 35, 38 (Page ID #822–23). The court did not address whether, assuming that either or both violated *Miranda*, their admission was harmless, although it noted that Simpson's "June 2000 interrogations constituted overwhelming evidence of his guilt." *Id.* ¶ 27 (Page ID #819).

"[F]or reasons not material to this case," the Ohio Court of Appeals vacated Simpson's sentence and remanded his case for resentencing. *Simpson*, 615 F.3d at 427. The trial court

resentenced him "to a total term of imprisonment of no less than seventy-nine years, and potentially life, in prison." *Id.*

### 3. This Court partially grants Simpson's § 2254 petition.

Simpson sought habeas relief in the United States District Court for the Southern District of Ohio. R. 2 (Section 2254 Petition) (Page ID #9). In a Report and Recommendation, a magistrate judge agreed with the Ohio Court of Appeals' analysis of Simpson's two April statements, but "directed the state to supplement the record" with tapes or transcripts of Simpson's two June statements. R. 20 (4/16/07 R. & R. at 38–39) (Page ID #176–77); *Simpson*, 615 F.3d at 427. In a second Report and Recommendation, the magistrate judge rejected all of Simpson's *Miranda* claims. R. 33 (11/2/07 R. & R. at 21) (Page ID #253). The district judge dismissed Simpson's habeas petition. R. 37 (1/2/08 Op. and Order at 5) (Page ID #270).

This court partially reversed. The panel first addressed the merits of Simpson's *Miranda* claims, then turned to harmless error. On the merits, the panel held that the Ohio Court of Appeals unreasonably applied *Miranda* and its progeny when it upheld the trial court's admission of Simpson's April 24, April 27, and June 20 statements. *Simpson*, 615 F.3d at 424. The panel first analyzed the June statements. It determined that Simpson's June 16 statement was not obtained in violation of *Miranda*. *Id.* at 434. However, the court held that during Simpson's June 20 interrogation, Walker (the polygrapher) impermissibly dissuaded Simpson from speaking with an attorney. *Id.* at 436–39. Turning to Simpson's two April statements, the court held that *both* were admitted in violation of *Miranda*, because Simpson was in custody (but

13

wasn't Mirandized) when he spoke with Kallay and Ozbolt on April 24 and April 27. *Id.* at 439–42.

Having found constitutional error, the panel then held that the state trial court's admission of Simpson's April 24, April 27, and June 20 statements was "harmless as to Simpson's convictions for aggravated arson and felonious assault" (the two general-intent crimes), but was "not harmless as to the convictions for aggravated murder, murder, and attempted murder" (the specific-intent offenses). *Id.* at 424; *see id.* at 442–45. The court thus vacated Simpson's convictions for those three specific-intent crimes, but did not disturb Simpson's felonious-assault or aggravated-arson convictions. *Id.* at 445.

Judge White wrote separately. She would have held that *all four* of Simpson's statements were obtained in violation of *Miranda*, and that admission of none of the statements was harmless. *Id.* at 445–48 (White, J., dissenting in part, concurring in part).

**4. The Supreme Court issues *Howes v. Fields*.**

The Warden petitioned for certiorari on October 4, 2010. Warden's Pet. for Cert. at 29. While that petition was pending, the Supreme Court decided *Howes*, the basis for the grant-vacate-and-remand ("GVR") order in Simpson's case. *Howes* overturned this court's habeas grant in *Fields v. Howes*, 617 F.3d 813 (6th Cir. 2010), *rev'd*, *Howes v. Fields*, 132 S. Ct. 1181 (2012), and clarified *Miranda*'s force in jailhouse interrogations. In *Fields*, a divided panel of this court had held that the Michigan Court of Appeals unreasonably applied *Mathis v. United States*, 391 U.S. 1 (1968), when it affirmed the admission of statements that an inmate (Fields)

14

made during a jailhouse interrogation. *Fields*, 617 F.3d at 815–16. Our court in *Fields* read *Mathis* as standing for a bright-line rule: "The central holding of *Mathis* is that a *Miranda* warning is required whenever an incarcerated individual is isolated from the general prison population and interrogated, i.e. questioned in a manner likely to lead to self-incrimination, about conduct occurring outside of the prison." *Id.* at 818.

The Supreme Court reversed. *Mathis*, the Court explained, did not establish such a "categorical rule." *Howes*, 132 S. Ct. at 1192. Rather, whether an inmate should be considered "in custody" under *Miranda* depends on the totality of the circumstances surrounding his interrogation. *Id.* at 1189, 1192. "[S]ervice of a term of imprisonment, without more," the Court wrote, "is not enough to constitute *Miranda* custody." *Id.* at 1191.

**5. The Supreme Court GVRs Simpson's case, and on remand the district court affirms this court's habeas grant.**

The Supreme Court granted the Warden's petition for certiorari and remanded Simpson's case "for further consideration in light of *Howes*." *Sheets v. Simpson*, 132 S. Ct. 1632 (2012). We remanded Simpson's case to the district court. R. 65 (7/1/13 Order) (Page ID #434).

The magistrate judge issued a Report and Recommendation concluding that "*Howes* does not alter the outcome of this case" and recommending that Simpson's habeas petition be granted consistent with this court's 2010 opinion. R. 86 (11/10/14 R. & R. at 28–29) (Page ID #4306–07). The district judge adopted and affirmed the Report and Recommendation, granting Simpson's § 2254 petition as to his aggravated-murder, murder, and attempted-murder

15

convictions. R. 93 (3/11/15 Op. and Order at 3–4) (Page ID #4401–02). The Warden timely

appealed. R. 95 (Resp't Warden's Notice of Appeal) (Page ID #4404).

## II. ANALYSIS

The central issue in this appeal is whether the Supreme Court's decision in *Howes*

changes the reasoning or outcome of this court's 2010 *Simpson* opinion. "[A] GVR order does

not necessarily imply that the Supreme Court has in mind a different result in the case, nor does

it suggest that our prior decision was erroneous." *In re Whirlpool Corp. Front-Loading Washer*

*Products Liab. Litig.*, 722 F.3d 838, 845 (6th Cir. 2013). Rather, the GVR order poses a narrow

question: does *Howes* "compel[] a different resolution" of Simpson's case? *Id.*

We answer that question: "yes and no." We affirm the district court's partial habeas

grant, but we do so on different grounds. The 2010 panel held that three of the four statements

Simpson gave—on April 24, April 27, and June 20—were unconstitutionally obtained and

admitted against Simpson in violation of *Miranda*. The district court reached the same result on

remand. We think that that conclusion does not withstand scrutiny under *Howes*. Mindful of the

high bar that AEDPA imposes, we conclude that no clearly established federal law confirms that

Simpson was "in custody" when he made his two jailhouse statements on April 24 and April 27.

However, we do not believe—and the Warden does not argue—that *Howes* changes the

2010 panel's conclusion that Simpson's *June 20* statement was admitted against him in violation

of *Miranda*. Further, we conclude that that error was not harmless as to Simpson's convictions

for the three specific-intent offenses of aggravated murder, murder, and attempted murder. Thus,

like the 2010 panel and the district court on remand, we grant in part Simpson's habeas petition and vacate his convictions for aggravated murder, murder, and attempted murder.

## A. Standard of Review

We review de novo the "district court's legal conclusions and mixed questions of law and fact." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013). Our review has two parts. First, under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may grant Simpson habeas relief only if the Ohio Court of Appeals—which issued "the last reasoned state-court opinion" in this case, *Ylst v. Nunnemaker*, 501 U.S. 797, 804–05 (1991)—adjudicated Simpson's *Miranda* claims on the merits in a way "that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Second, if we find that any of Simpson's statements were admitted in violation of *Miranda*, we then need to determine whether their admission was harmless error. *Arizona v. Fulminante*, 499 U.S. 279, 309–12 (1991). Because Simpson's case is on collateral review, Simpson is "not entitled to habeas relief" on his *Miranda* claims "unless [he] can establish that" the trial court's admission of his statements "resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Under this standard, "relief is proper only if" we have "grave doubt about whether" the trial court's admission of Simpson's statements "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (quoting *O'Neal v. McAninch,* 513 U.S. 432, 436 (1995)) (internal quotation marks omitted).

17

No. 15-3260
*Simpson v. Warden, Warren Corr. Inst.*

**B. Simpson's *Miranda* claims.**

*Howes* compels a different resolution of certain aspects of Simpson's case, but not a different end result. We affirm, on different grounds, the district court's partial grant of habeas relief.

In light of the totality of circumstances surrounding Simpson's April 24 and April 27 jailhouse interrogations, no clearly established federal law confirms that they were custodial. Thus, Simpson's *Miranda* claims as to his two April statements fail.

However, *Howes* does not change the 2010 panel's conclusion that Simpson's June 20 statement was obtained and admitted against him in violation of *Miranda*. The Warden has made no argument to the contrary. Because the trial court's admission of Simpson's June 20 statement was not harmless error, we reach the same result as the district court on remand: we vacate Simpson's convictions for aggravated murder, murder, and attempted murder.[2]

**1. Under *Howes*, Simpson's April 24 and April 27 statements were not obtained in violation of *Miranda*, because he was not in custody when he made those statements.**

The district court erred on remand. We read *Howes* as confirming that Simpson was *not* in custody during his April 24 or April 27 interrogations. Thus, Kallay and Ozbolt were not required to Mirandize Simpson on either date. Simpson's *Miranda* claims as to these two statements fail.

---

[2]Simpson does not challenge the 2010 panel's conclusion that his June 16 statement was admitted properly against him.

### a. Simpson's April 24 interrogation was non-custodial.

The Ohio Court of Appeals did not unreasonably apply federal law when it held that Simpson was not in custody on April 24. The thrust of *Howes* is that "a prisoner is [not] always in custody for purposes of *Miranda* whenever a prisoner is isolated from the general prison population and questioned about conduct outside the prison." *Howes*, 132 S. Ct. at 1188–89; *see also Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[L]awful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*."). Rather, whether a prisoner in that situation is "in custody" depends on a *Miranda* totality-of-the-circumstances analysis. *Howes*, 132 S. Ct. at 1189. Because some factors suggest that Simpson was in custody on April 24, and others do not, AEDPA bars us from granting Simpson relief on this claim.

*Howes* identified a number of factors relevant to the question whether a prisoner is "in custody" when he is interrogated in prison. As an "initial step," this questions turns on whether a reasonable person in the prisoner's position would have felt free to leave the interrogation, an inquiry that includes factors such as:

1. "[T]he location of the questioning";

2. "[I]ts duration";

3. "[S]tatements made during the interview";

4. "[T]he presence or absence of physical restraints"; and

5. "[T]he release of the interviewee at the end of the questioning."

*Id.* However, "standard conditions of confinement and associated restrictions on freedom"—i.e., the conditions and restrictions that attend prisoners' daily lives—do not automatically render prison interrogations custodial. *Id.* at 1190–91. *Howes* gave three reasons why this is so: (1) "questioning a person who is already serving a prison term does not generally involve the shock that very often accompanies arrest"; (2) "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release"; and (3) "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Id.*

Some of the factors *Howes* listed suggest that Simpson was in custody on April 24, and others do not. We see two strong arguments in Simpson's favor. First, Kallay and Ozbolt never told Simpson that he could end the interview. *See* Supp. Br. of Resp.-Appellee (6th Cir. 08-3224, July 26, 2012) at 23 ("Simpson is also correct that the failure of the police to inform him he could stop the interview also weighs in favor of finding custody."). *Howes* cited the fact that Fields's interrogators told Fields that he could leave his interrogation as the "[m]ost important" factor suggesting that Fields's jailhouse interview was non-custodial. *Howes*, 132 S. Ct. at 1193; *see id.* at 1194 (emphasizing "undisputed fact that respondent was told that he was free to end the questioning and to return to his cell"). That Kallay and Ozbolt never told Simpson he could leave the conference room strongly suggests that "a reasonable person" in Simpson's position

would not have felt "at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Second, contrary to the hypothetical prison-interview scenarios *Howes* envisioned, Simpson knew that Kallay and Ozbolt *could* get him out of prison. They promised him as much: the officers told Simpson that they would secure his early release if he gave them information about the arson. Unlike the typical inmate *Howes* pictured, Simpson was likely "lured into speaking by a longing for prompt release," *Howes*, 132 S. Ct. at 1191—a longing strengthened by the then-recent birth of Simpson's child.

On the other hand, some of the *Howes* factors suggest that Simpson was not in custody on April 24. For one, the interview was short: it lasted less than an hour. *Cf. Howes*, 132 S. Ct. at 1193 (five-to-seven-hour prison interview that "continued well past the hour when respondent generally went to bed" was non-custodial); *Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984) (routine traffic stops are non-custodial because they are "presumptively temporary and brief"). Nor was Simpson physically restrained: we have read nothing in the record suggesting that Simpson was handcuffed or otherwise restrained when he spoke with Kallay and Ozbolt on April 24. *See* Simpson Br. at 26 n.5; *cf. New York v. Quarles*, 467 U.S. 649, 655 (1984) (respondent was in custody when police officers handcuffed and surrounded him). Moreover, during the April 24 interrogation (and unlike the two June interrogations), Kallay and Ozbolt didn't use aggressive questioning tactics: at that point, the officers didn't consider Simpson a suspect, and they were trying to convince Simpson to cooperate with their arson investigation. *Cf. Stansbury*

*v. California*, 511 U.S. 318, 325 (1994) (although officers' statements to suspects are relevant to custody analysis, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue").

The upshot of these opposing factors is this: although *Howes* gives us good reason to conclude that Simpson was in custody on April 24, AEDPA requires more. The Ohio Court of Appeals' decision rejecting Simpson's *Miranda* claim was not an unreasonable application of federal law if "'fairminded jurists could disagree' on the correctness of [that] decision.'" *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). AEDPA's bar to relief applies with even greater force where, as here, we are evaluating a state-court decision that applied a flexible, fact-specific rule. *See Renico v. Lett*, 559 U.S. 766, 776 ("'[T]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" (quoting *Alvarado*, 541 U.S. at 664)). Because fairminded jurists could debate whether Simpson was in custody on April 24, we hold that the Ohio Court of Appeals did not unreasonably apply federal law when it held that Simpson was not in custody during his interrogation on that date. *See Harrington*, 562 U.S. at 101.

**b. Simpson's April 27 statement was also non-custodial.**

Likewise, the Ohio Court of Appeals did not unreasonably apply federal law when it held that Simpson was not in custody on April 27. The 2010 panel analyzed both April statements jointly when it considered whether they were inadmissible under *Miranda*. *Simpson*, 615 F.3d at 439–42. This approach is problematic because *Howes* requires more: whether Simpson was in

custody on April 27 is a fact-specific question that merits independent analysis. Relatedly, the original panel's opinion could be read as adopting a rule that *Howes* disclaimed: that under *Mathis* and *Miranda,* a prisoner who is interrogated about an offense that took place "outside the prison walls" is *categorically* in custody. *Howes*, 132 S. Ct. at 1188. Looking to the totality of circumstances surrounding Simpson's April 27 interview—as *Howes* instructs—we cannot say it would be unreasonable to hold that he was not in custody.

Like the April 24 interrogation, some parts of the April 27 interrogation support Simpson's argument that he was in custody, and some cut the other way. Among the factors supporting custody are: (1) Kallay and Ozbolt never told Simpson that he could end the April 27 interrogation, *see* Supp. Br. of Resp.-Appellee (6th Cir. 08-3224, July 26, 2012) at 30; and (2) Simpson was in the infirmary when he spoke to the officers on April 27, which suggests that he felt unable (or, perhaps, *was* unable) to walk away. On the other hand: (1) the interview lasted about thirty minutes (i.e., half the length of Simpson's April 24 interview); and (2) Kallay and Ozbolt were still attempting to persuade Simpson to cooperate with their investigation, and thus did not aggressively question Simpson. In sum, whether Simpson was in custody on April 27 is fairly debatable. For that reason, we conclude that this claim does not warrant habeas relief. *See Harrington*, 562 U.S. at 101.

**2.** ***Howes*** **does not alter the 2010 panel's conclusion that Simpson's June 20 statement was admitted in violation of** ***Miranda*****, and the trial court's admission of this statement against Simpson was not harmless.**

That leaves Simpson's June 20 statement. Because we hold that Simpson's April 24 and April 27 statements were *not* obtained in violation of *Miranda*, whether Simpson deserves

23

habeas relief depends on two questions. First, does *Howes* alter the 2010 panel's conclusion that Simpson's June 20 statement was admitted against Simpson in violation of *Miranda*? Second, if Simpson's June 20 statement was inadmissible, was its admission harmless?

We answer "no" to both questions. *Howes* does not alter the 2010 panel's analysis of Simpson's June 20 statement: that statement was obtained in violation of *Miranda*, and the Warden makes no argument to the contrary. We are also satisfied that the trial court's admission of Simpson's June 20 statement was not harmless as to Simpson's convictions for the three specific-intent crimes of which he was found guilty: aggravated murder, murder, and attempted murder. We thus vacate Simpson's convictions for those three offenses.

### a. Simpson's June 20 statement was inadmissible under *Miranda*.

For two reasons, we do not believe that *Howes* changes the 2010 panel's conclusion that Simpson's June 20 statement was obtained in violation of *Miranda*. First, *Howes* does not speak to the *Miranda* issue that Simpson's June 20 statement raises. Second, the Warden has not argued on appeal that Simpson's June 20 statement was admissible—under *Howes* or otherwise. For both reasons, we hold that Simpson's June 20 statement was obtained and admitted against Simpson in violation of *Miranda*.

To begin, *Howes* does not address the dispositive *Miranda* issue that Simpson's June 20 statement implicates. *Howes* concerns the circumstances in which a prisoner may be considered "in custody" under *Miranda*. However, neither party disputes that Simpson *was* in custody on June 20; indeed, Walker gave Simpson a *Miranda* waiver form during the interrogation. Rather, the key issue—and the reason the prior panel found constitutional error—was that Walker

24

impermissibly discouraged Simpson from exercising his *Miranda*-guaranteed right to counsel. *See Simpson*, 615 F.3d at 436–39; R. 86 (11/10/14 R. & R. at 17) (Page ID #4295). Moreover, *Howes* speaks to interrogations that occur in prison. Simpson, however, was not in prison on June 20—he gave his statement at a Columbus police station. *Howes* thus does not change the 2010 panel's conclusion that Simpson's June 20 statement was obtained in violation of *Miranda*.

The Warden appears to agree. Supp. Br. of Resp.-Appellee (6th Cir. 08-3224, July 26, 2012) at 40 ("[T]his Court's decision in *Simpson*, and everything in it, remains correct, except what must be reexamined in light of *Fields*. *Fields*, of course, concerns how *Miranda* custody applies to a prisoner, a matter that only applies to the April interviews."). Before the district court on remand, the Warden argued that Simpson's June 20 confession was voluntary and that Walker did not improperly dissuade Simpson from invoking his right to counsel. R. 83 (Resp't's Br. in Response to Pet'r's Supp. Br. at 22–27 (Page ID #4181–86); R. 91 (Resp't Warden's Response to Pet'r's Obj. to R&R at 3) (Page ID #4363). On appeal, however, the Warden's sole argument concerning Simpson's June 20 statement is that the trial court's admission of that statement was harmless. Resp.-Appellant's Merit Br. at 32–33; Resp.-Appellant's Reply Br. at 6–9. The Warden thus gives us no reason to question our conclusion that, even in light of *Howes*, Simpson's June 20 statement was inadmissible under *Miranda*

### b. The trial court's erroneous admission of Simpson's June 20 statement was not harmless.

Although *Howes* does not change the 2010 panel's conclusion that Simpson's June 20 statement was admitted in violation of *Miranda*, it does change our harmless-error calculus.

Because the 2010 panel determined that *three* of Simpson's statements were obtained in violation of *Miranda*—those on April 24, April 27, and June 20—it evaluated their cumulative prejudicial effect when it assessed whether their admission was harmless. *Simpson*, 615 F.3d at 442–45. Under *Howes*, however, Simpson's April 24 and April 27 statements were *not* obtained in violation of *Miranda*. That narrows our harmless-error inquiry: was the trial court's admission of Simpson's June 20 statement—*standing alone*—harmless error as to Simpson's convictions for aggravated murder, murder, and attempted murder?

We answer that question: "no." Before explaining why, a note about harmless error and our standard of review. When the last-reasoned state-court decision in a habeas case analyzes a petitioner's constitutional claims for harmless error, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Davis*, 135 S. Ct. at 2199 (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)); *see id.* at 2198 ("[T]he *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's [harmlessness] determination . . . ."). The Ohio Court of Appeals determined that any error in admitting Simpson's two *April* statements was harmless. However, that court did not address whether the trial court's admission of Simpson's *June 20* statement was harmless error. We thus assess the harmlessness of Simpson's June 20 statement under *Brecht*, not *Brecht* viewed through the prism of § 2254(d)(1). *Id.* at 2197–99. To recap: under that standard, Simpson is "not entitled to habeas relief . . . unless [he] can establish that" the trial court's

admission of his June 20 statement "resulted in 'actual prejudice.'" *Id.* at 2197 (quoting *Brecht*, 507 U.S. at 637).

For two reasons, we hold that the trial court's admission of Simpson's June 20 statement was not harmless under *Brecht*. First, the Warden waived this harmless-error argument. Second, even if the Warden did not waive this harmless-error defense, it fails: the trial court's admission of Simpson's June 20 statement was not harmless as to Simpson's convictions for aggravated murder, murder, and attempted murder. We thus vacate Simpson's convictions for those three offenses, reaching the same result but for different reasons than those of the 2010 panel.

> **(1)  The Warden waived the argument that the trial court's admission of Simpson's June 20 statement was harmless error.**

The Warden waived the argument that Simpson's June 20 statement was harmless. "[T]he harmless error defense can be waived." *Lovins v. Parker*, 712 F.3d 283, 303 (6th Cir. 2013); *see* Randy Hertz & James S. Liebman, 2 *Federal Habeas Corpus Practice and Procedure* § 31.2[a] (6th ed. 2011) ("Like other defenses to habeas corpus relief, the 'harmless error' obstacle does not arise unless the state asserts it; the state's failure to do so in a timely and unequivocal fashion waives the defense."). *But see Gover v. Perry*, 698 F.3d 295, 301 (6th Cir. 2012) (when entertaining habeas petition, "this court has discretion to consider harmlessness sua sponte when reviewing for constitutional error"). Just so here: by failing to raise the issue below, the Warden waived the argument that admission of Simpson's June 20 statement was harmless error.

In the most recent round of briefs before this court, the Warden argues—for the first time—that the trial court's admission of Simpson's June 20 statement was harmless error. Resp.-Appellant's Merit Br. at 32–33. The Warden did not make this argument in response to Simpson's initial habeas petition. R. 9 (Resp.'s Answer/Return of Writ) (Page ID #27). Nor did the Warden raise this harmless-error argument during the first round of briefs before this court. Br. of Resp't-Appellee (6th Cir. 08-3224, June 23, 2009). Indeed, at oral argument in April 2010, counsel for the Warden conceded that the trial court's admission of Simpson's June 16 and 20 statements were *not harmless*. Simpson Supp. Br. (6th Cir. 08-3224, July 12, 2012), Addendum at 32a–33a.

On remand, the Warden argued—in cursory, conclusory fashion—that admission of Simpson's June 20 statement was harmless. R. 83 (Resp't's Br. in Response to Pet'r's Supp. Br. at 31–32 (Page ID #4190–91); R. 91 (Resp't Warden's Response to Pet'r's Obj. to R&R at 2–3, 8) (Page ID #4362–63, 4368). "[S]uch a perfunctory discussion of harmless error" is insufficient to preserve this argument. *United States v. Johnson*, 467 F.3d 559, 564 (6th Cir. 2006). The Warden thus waived the argument that the trial court's admission of Simpson's June 20 statement was harmless.

### (2) Simpson's June 20 statement was not harmless.

Even if the Warden had not waived this harmless-error argument, it would fail on the merits: the trial court's admission of Simpson's June 20 statement was not harmless.[3] "For

---

[3]Simpson makes this argument—that the trial court's admission of his June 20 statement, standing alone, merits habeas relief—in his brief, but the Warden argues that Simpson waived it. Simpson Br. at 44–56; Warden

reasons of finality, comity, and federalism," Simpson is "not entitled to habeas relief" unless the trial court's admission of his June 20 statement actually prejudiced him. *Davis*, 135 S. Ct. at 2197 (quoting *Brecht*, 507 U.S. at 637). In evaluating whether Simpson has satisfied *Brecht*, our "'inquiry cannot be merely whether there was enough to support the result'" of Simpson's trial "apart from the phase affected by the error." *O'Neal*, 513 U.S. at 438 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "It is rather, even so, whether the error itself had substantial influence. If so, *or if one is left in grave doubt*, the conviction cannot stand.'" *Id.* (quoting *Kotteakos*, 328 U.S. at 765).

Simpson has satisfied *Brecht*. We have, at minimum, "grave doubt about whether" the trial court's erroneous admission of Simpson's June 20 statement "had 'substantial and injurious effect or influence in determining the jury's verdict'"—insofar as that verdict pronounced Simpson guilty of aggravated murder, murder, and attempted murder. *Davis*, 135 S. Ct. at 2197–98 (quoting *O'Neal*, 513 U.S. at 436). Examining the elements of those three crimes in light of the admissible evidence that Simpson's jury received makes this plain.

Simpson's trial judge instructed Simpson's jury that in order to convict Simpson of aggravated murder, murder, or attempted murder, they would have to determine that Simpson *purposefully* killed (or attempted to kill) the occupants of 151 South Wheatland Avenue. R. 79-13 (Trial Tr. (5/31/01) at 82:24–83:4, 89:4–8, 90:5–7, 91:7–14, 95:12–15, 96:14–19) (Page ID #3802–03, 3809, 3810, 3811, 3815, 3816). Here is how the judge defined "purpose":

Reply Br. at 6–9. The Warden is incorrect. Simpson made this argument in his two briefs to the district court on remand. R. 80 (Pet'r's Supp. Br at 15–23) (Page ID #4138–46); R. 84 (Pet'r's Supp. Reply Br. at 3–15) (Page ID #4202–14). Simpson did not waive this argument—he preserved it.

> A person acts purposely when it is his specific intention to cause a certain result. . . . Purpose is further defined as a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct. Moreover, the purpose with which a person does an act may be determined from the manner in which it is done, the means used and all of the other facts and circumstances in evidence.

*Id.* at 83:7–24 (Page ID #3803); *see id.* at 91:17–92:13 (Page ID #3811–12). Under that definition of purpose, Simpson's jury could not convict Simpson of aggravated murder, murder, or attempted murder unless it found—beyond a reasonable doubt—that Simpson *specifically intended* to murder the six people inside 151 South Wheatland.

Assuming that Simpson's April 24 and April 27 statements were constitutionally obtained, just *five* pieces of admissible evidence tied Simpson to the arson:

1. Simpson's April 24 statement, in which he laid blame for the arson on Smith and Kelly;

2. Simpson's April 27 statement, in which he reiterated the account he gave Kallay and Ozbolt on April 24;

3. Simpson's June 16 statement, in which Simpson (a) admitted to Kallay and Ozbolt that he drove Kelly close to the scene of the crime and that Kelly assembled a Molotov cocktail during the ride, but (b) maintained that he had no idea that Kelly planned to burn down 151 South Wheatland;

4. A statement that a sheriff's deputy overheard Simpson make in jail: "[W]hy didn't they charge the bitch too. It was her idea to start the fire."; and

5. A statement Simpson allegedly made to a fellow inmate that he was one of three people involved in the arson, and that the arson involved Molotov cocktails.

30

That is thin evidence of Simpson's *specific intent* to kill anyone inside 151 South Wheatland Avenue. No physical evidence inculpated Simpson. No eyewitnesses testified against him. The *only* evidence the state introduced against Simpson were his own statements. And one of those statements—June 20—was the centerpiece of the prosecution's theory of the case: that Simpson *purposefully* helped start the fire at 151 South Wheatland. R. 79-13 (Trial Tr. at 14:3–11, 62:9–63:22 (Page ID #3733, 3782–83).

We think it clear why Simpson's June 20 statement was so critical to the state's case. It was not until June 20 that Simpson admitted that he knew—*a week in advance*—that Smith and Kelly planned to start the fire. *That* is powerful evidence that Simpson had the specific intent to kill the occupants of 151 South Wheatland when he drove Kelly, who assembled a Molotov cocktail during the ride, to the scene of the crime. Put simply, we are confident that the trial court's decision to admit Simpson's June 20 statement "had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis*, 135 S. Ct. at 2198 (quoting *O'Neal*, 513 U.S. at 436).

On remand, the magistrate judge rejected Simpson's argument that the trial court's admission of his June 20 statement, alone, merits habeas relief. R. 86 (11/10/14 R. & R. at 18–19) (Page ID #4296–97). The magistrate judge reasoned that the 2010 panel's decision "explicitly rejects" that claim. *Id.* at 19 (Page ID #4297). We disagree. The 2010 panel concluded that the April 24, April 27, and June 20 statements were not harmless because (1) Simpson's June 20 statement established that he was involved directly with the arson, and

31

(2) his April 24 and April 27 statements undermined his credibility, which the prosecution used

"in support of its theory that Simpson shared Kelly's intent and purpose." *Simpson*, 615 F.3d at

444. The 2010 panel wrote:

> [E]ven in the June 20th statement, Simpson still maintained that he had not been involved in the planning of the arson or in making the Molotov cocktails, and had no intent to kill anyone. Thus, to prove that Simpson acted with the purpose of causing the death of another, the State needed something more than Simpson's own admissions. Creatively, the State turned to Simpson's April denials to prove this element.

*Id.* at 442. That reasoning does not *foreclose* Simpson's argument about the stand-alone

prejudice of his June 20 statement. The 2010 panel concluded that three of Simpson's statements

were admitted in error; it is logical that the panel would consider their cumulative prejudicial

effect on Simpson's trial. The GVR order, however, does not require *this* panel to adhere to that

reasoning. Indeed, adopting wholesale the 2010 panel's harmless-error analysis would be

impossible, given that *Howes* fundamentally changes the merits of Simpson's *Miranda*

arguments by confirming that his April 24 and April 27 statements were not admitted

erroneously. In any event, we are satisfied that the trial court's admission of Simpson's June 20

statement, standing alone, was not harmless.

The Ohio Court of Appeals put this issue well: "Without question, the most

incriminating evidence presented against [Simpson] at trial were his own statements." R. 78-1

(7/23/02 Ohio Ct. App. Op. ¶ 19) (Page ID #816). And one statement stands above the rest:

Simpson's June 20 statement, in which Simpson admitted that he knew that Smith and Kelly

were planning to commit arson well before he drove Kelly to the scene of the crime. Removing

that statement from the trial record leaves virtually no evidence tending to show that Simpson acted with murderous intent when he drove Kelly to 151 South Wheatland Avenue. That gives us "grave doubt" about the prejudicial effect of the trial court's erroneous admission of Simpson's June 20 statement. We thus affirm the district court's judgment vacating Simpson's three specific-intent convictions: aggravated murder, murder, and attempted murder.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's partial grant of habeas relief.